In re Harry A. JOHNSON, Jr., Debtor.

RESOLUTION TRUST CORPORATION, as receiver for Midwest Savings Association, F.A., Plaintiff,

v.

Harry A. JOHNSON, Jr., Defendant.

Bankruptcy No. 3–89–1457.
Adv. No. 3–90–287.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 24, 1992.

Timothy M. Walsh, Brian F. Kidwell, St. Paul, Minn., for plaintiff.

Michael J. Meyer, Minneapolis, Minn., for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court on August 13, 1991, for hearing on the parties' cross-motions for summary judgment. The Committee of Unsecured Creditors in Defendant's bankruptcy case appeared by its attorney, Steven L. Freeman. Upon the moving and responsive documents, their evidentiary attachments, and the arguments of counsel, the Court makes the following order.

Defendant is a Chapter 11 debtor in a case which is still pending in this Court. He filed for bankruptcy relief on April 21, 1989; on March 15, 1991, the Court confirmed his plan of reorganization. Defendant is a Minneapolis-area plastic surgeon; before his bankruptcy filing he was extensively involved in commercial real estate development, and owned and operated several hotels. Plaintiff is the successor-in-interest to Midwest Federal Savings and Loan Association of Minneapolis ("Midwest Federal"), a now-defunct financial institution.[1]

### UNCONTROVERTED FACTS

The documentary facts are undisputed. On April 10, 1986, Defendant borrowed the sum of $12,000,000.00 from one of Midwest Federal's affiliates, in connection with the construction and development of the Holiday Inn Minneapolis West in St. Louis Park ("the hotel"). The parties evidenced Defen-

---

1. Plaintiff attained this position through an involved series of actions by various federal regulatory agencies with administrative jurisdiction over banking institutions. In large part, the minutiae of this process are irrelevant; Defendant does not contest Plaintiff's standing. The regulators took control of Midwest Federal and then phased out its operations in a novel way; this all took place around the time of Defendant's bankruptcy filing, and the several successors to Midwest Federal took a dynamic role in the case. As a result, some aspects deserve mention. Midwest Federal was placed into conservatorship in February, 1989. On May 4, 1989, the regulators converted this conservator-

ship into a receivership. The receiver immediately created a new entity, Midwest Savings Association, F.A. ("Midwest Savings"), transferred Midwest Federal's assets to it, and then placed Midwest Savings into conservatorship. Plaintiff afterwards became the conservator, and then (in October, 1990) the receiver of Midwest Savings. The nominal identity of the holder of Midwest Federal's rights thus changed several times during the events which gave rise to this adversary proceeding. For the sake of historical accuracy, references in this order to the holder will denote the actual entity-in-interest at each given point.

dant's obligation by a promissory note; the debt was secured by a first mortgage against the hotel and its underlying real estate, and a security interest in the personalty associated with the hotel. Defendant granted these liens via an instrument entitled "Mortgage and Security Agreement and Fixture Financing Statement," also dated April 10, 1986.[2] In "Granting Clause B" of the instrument, Defendant granted the mortgagee a lien in

> ... all buildings, equipment, fixtures, improvements, building supplies and materials and *personal property now owned or hereafter acquired and now or hereafter attached to, located in, placed in or necessary to the use of the improvements on the [hotel] Premises* including, but without being limited to all machinery, fittings, fixtures, apparatus, equipment or articles used to supply heating, gas, electricity, air conditioning, water, light, waste disposal, power, refrigeration, ventilation, and fire and sprinkler protection, as well as all elevators, escalators, overhead cranes, hoists and assists, and the like, and all *furnishings*, supplies, draperies, maintenance and repair equipment, floor coverings, appliances, screens, storm windows, blinds, awnings, shrubbery and plants, ranges, stoves, ovens, refrigerators, air conditions [sic], garbage disposals, dishwashers, clothes dryers, washing machines, televisions, telephones, phone systems, desks, chairs, tables, beds and bed linens, dressers and other furniture (*it being understood that the enumeration of any specific articles of property shall in no way be held to exclude any items of property not specifically enumerated*), as well as renewals, replacements, proceeds, additions, accessories, increases, parts, fittings and substitutes thereof, together with all interest of [Defen-

dant] in any such items hereafter acquired, all of which personal property mentioned herein shall be deemed fixtures and accessory to the freehold and a part of the realty and not severable in whole or in part without material injury to the premises, but excluding therefrom the removable personal property of any tenant or licensee of the Premises ...

(emphasis added). The affiliate later assigned its rights as creditor and secured party to Midwest Federal. On May 16, 1986, Midwest Federal filed the mortgage with the Hennepin County Recorder, and a UCC–1 financing statement with the Minnesota Secretary of State. Defendant never set up a separate legal entity, such as a corporation or partnership, to own and operate the hotel; he continued to hold it as a sole proprietor at all relevant times through and after his bankruptcy filing.

Certain other historical and procedural facts are also undisputed. In 1986–87, Defendant commissioned approximately 30 paintings[3] from one Mark King, an artist who has since gained some renown. Records maintained by the marketing agent for the artist indicate that Defendant paid approximately $31,000.00 for the artwork. Defendant acknowledges that these funds came from revenues from the hotel. Defendant placed these paintings on-site at the hotel, as a part of the decor in its public areas.[4]

When Defendant filed his bankruptcy schedules, he included an entry on his Schedule B–2 for art objects, with a stated value of $43,000.00. He did not give a specific description of the items in this category. As it has turned out, the Mark King artwork constitutes most, if not all, of the items. He did not indicate on his Schedule B–2 that any of the scheduled artwork was security for a scheduled debt.[5]

---

**2.** Section 3.1 of this instrument provided that it "shall constitute a security agreement as defined in the Uniform Commercial Code," and that Defendant was granting a security interest, as defined in the UCC, in the personalty described in other parts of the instrument.

**3.** More specific testimony at the confirmation hearing in Defendant's case indicated that 26 paintings were then extant.

**4.** Plaintiff has produced uncontroverted, probative, and convincing evidence that the styles and themes of the paintings well-matched the decor of various areas in the hotel.

**5.** For brevity, the phrase "the artwork" shall denote the 26 Mark King paintings as a group.

In August, 1989, Midwest Savings brought on a motion for relief from stay, seeking leave to foreclose its liens against the hotel and other properties owned by Defendant. After lengthy negotiations, the parties entered into a comprehensive settlement agreement. By an order entered on December 18, 1989, this Court approved the agreement. Under its terms, Defendant acknowledged the liens previously granted against the hotel and its associated personal property without qualification, and consented to a grant of relief from stay to Midwest Savings so as to allow it to commence foreclosure against its security. Midwest Savings agreed to time the foreclosure process so as to guarantee Defendant a redemption period which would expire no earlier than September 8, 1990. It also agreed that Defendant would retain all of his redemption rights under state law.

On January 20, 1990, Defendant and his son entered the hotel premises and, without the consent of Midwest Savings, removed most of the Mark King paintings from where they were hung.[6] They then hung them in Defendant's Edina medical office in Edina, where they remained until at least late August, 1990.

Midwest Savings commenced foreclosure proceedings around this time. Defendant did not cure existing defaults as to the hotel; on March 8, 1990, the Hennepin County Sheriff sold it at a foreclosure sale. Plaintiff was the successful bidder.

On March 9, 1990, Defendant filed an amended disclosure statement.[7] The liquidation analysis in the disclosure statement included a line-entry for "Personal Art objects," stating their value as $31,667.00 on a liquidation basis. Again, it gave no other detail as to the identity of the items so named. Under the terms of the accompanying plan, Defendant proposed to be allowed to keep various nonexempt property after confirmation, by making payments out of his future earnings into an account for distribution to allowed unsecured claims. These payments were to be in amounts equal to the unencumbered value of such property. The Committee of Unsecured Creditors in Defendant's case objected to the disclosure statement and plan on a number of different grounds; the objections centered on the deficiency of disclosure as to the values of many classes of nonexempt assets, including artwork, with the insinuation that the values were understated. The Committee maintained its objection over several successive drafts of the disclosure statement. In the form finally submitted to creditors, the disclosure statement and plan proposed to set the amount of Defendant's payments into the distribution account according to values which were to be set jointly by him and the Committee. The Committee objected to confirmation on the ground that it had not yet reached agreement with Defendant on such values and, until it had, the plan as structured would not satisfy 11 U.S.C. § 1129(a)(7).

Some days prior to the August 29, 1990 confirmation hearing, the Committee and Defendant settled all issues joined in the Committee's objections. In testimony at the confirmation hearing, Defendant evinced a desire to retain six of the Mark King paintings under the "buyback" provision of the plan. He also testified to his consent to the sale or repossession of the remaining paintings, with the value thereof to go to the distribution account or to creditors holding valid liens in the pieces, "depending on the situation." Through the testimony of another witness, it was established that the Committee and Defendant had agreed to establish Defendant's price at a benchmark which was to be calculated

6. Plaintiff's complaint cites 18 as the number of the paintings removed. Testimony at the confirmation hearing in Defendant's case, and fact recitations in Plaintiff's briefs, indicated 16. The discrepancy does not seem to be material. For brevity, the phrase "the removed artwork" shall denote the paintings which were relocated to the medical office.

7. This pleading was presented as a joint disclosure with Mid–City Hotel Associates, a related debtor. In later proceedings in the cases, the Court required the two debtors to present separate plans, but allowed them to solicit acceptances via a joint disclosure statement.

from the results of the sale of the other pieces.

Midwest Savings accepted the plan's treatment of all three of its classified claims, via ballot and the acknowledgement of its counsel on the record. Its counsel was present through the hearing. When the hearing finally adjourned, the parties requested and were granted leave to resolve a subsisting objection by another of Defendant's major secured creditors.[8]

The period for redemption from the foreclosure sale of the hotel expired on September 8, 1990. Defendant neither timely redeemed any of the subject properties from the foreclosure, nor exercised his separate purchase option under the 1989 settlement agreement as to any of them. Pursuant to the agreement, Defendant immediately turned possession of the hotel over to Plaintiff.

### DISCUSSION.

Plaintiff commenced this adversary proceeding to obtain a declaratory judgment that it is the owner of all of the artwork as a result of the foreclosure of its asserted security interest therein, and to obtain legal and/or equitable relief to enforce that ownership interest. Defendant answered by denying Plaintiff's ownership, and by counterclaiming for a judgment compelling Plaintiff's surrender of the artwork which remained on-site at the hotel.

The parties completed discovery by the deadline set in the Court's Rule 16 order. They now make cross-motions for summary judgment. Plaintiff made the first motion. It asserts that the only material facts stem from various judicial and non-judicial legal proceedings, and are beyond dispute; hence, it argues, it is entitled to judgment as a matter of law on its main claim. Defendant argues that summary judgment for Plaintiff is precluded by the existence of triable fact issues going to Plaintiff's claim, but maintains that he is entitled to summary judgment on one or more of his

equitable defenses. Both parties essentially want to have the whole blanket. Plaintiff is the one that gets it.

### A. Whether a Security Interest in Favor of Plaintiff's Predecessor–In–Interest Attached to the Mark King Artwork.

Under the Minnesota enactment of Article 9 of the Uniform Commercial Code,

... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) ... the debtor has signed a security agreement which contains a description of the collateral ...

MINN.STAT. § 336.9–203(1). For the purposes of Article 9,

... any description of personal property ... is sufficient whether or not it is specific if it reasonably identifies what is described.

MINN.STAT. § 336.9–110.

The test of sufficiency of a description laid down by [Minn.Stat. § 336.9–110] is that the description do the job assigned to it—that it make possible the identification of the thing described.

Uniform Commercial Code Comment to MINN.STAT. § 336.9–110. In construing these provisions to determine whether the description in a particular security agreement encompasses assets in controversy, the Minnesota courts have noted that:

[t]he principal function of the description of the collateral in a security agreement is to enable the parties themselves or their successors-in-interest to identify it, particularly if the secured party has to repossess the collateral or claim it in a legal proceeding.

*James Talcott, Inc. v. Franklin Nat'l Bank of Minneapolis*, 292 Minn. 277, 286–287, 194 N.W.2d 775, 782 (1972); *Production Credit Assoc. of West Central Minn. v. Bartos*, 430 N.W.2d 238, 241 (Minn.Ct. App.1988). *See also Thorp Commercial*

---

**8.** That resolution was not forthcoming for almost three months; then, Plaintiff lodged another objection going to the legal niceties and tax ramifications of the proposed disposition of

another of Defendant's hotel properties. The Court entered a confirmation order as soon as the new problem was resolved, in March, 1991.

*Corp. v. Northgate Industries, Inc.*, 654 F.2d 1245, 1248 (8th Cir.1981) (applying Minnesota law). In a later opinion, the Minnesota Supreme Court characterized its construction of Minn.Stat. §§ 336.9–203(1) and 336.9–110 as embodying a "broad view of [their] collateral description requirements"—that is, the statutory words "reasonably identifies" signify a legislative intent to allow a broad scope in security-agreement descriptions, so long as the result of such inclusiveness comports with common sense and commercial reality. *World Wide Tracers, Inc. v. Metropolitan Protection, Inc.*, 384 N.W.2d 442, 446 (Minn.1986).

■ Given this legal backdrop and the undisputed transactional facts, Plaintiff prevails on this issue. The artwork clearly was "furnishings," under the common understanding of that term, and within the meaning of the mortgage instrument. In any event, it was "personal property;" the parties' specific intent to give a broad sweep to that general category is prominently evidenced by the provision of Granting Clause B which makes its lengthy enumeration of categories non-exclusive as to the types of assets to which the security interest would attach. The description is neither misleading nor ambiguous; thus, neither of these conclusions offends the description requirements of Article 9. *See World Wide Tracers, Inc. v. Metropolitan Protection, Inc.*, 384 N.W.2d at 446 (security agreement's description of "all goods," then-owned or thereafter-acquired, was sufficient to attach creditor's security interest to after-acquired motor vehicles and construction equipment). The mortgage instrument extended Midwest Savings's security interest to all after-acquired assets of the same types described in it, as Minn. Stat. § 336.9–204(1) allows. Since Defendant retained personal ownership of the hotel, the mortgage instrument's language operated to encumber anything he owned with Midwest Federal's lien, as soon as it was physically placed into the hotel for use in its operations. Thus, when Defendant acquired rights in the artwork, Minn.Stat. § 336.9–203(1)(c), and as soon as he placed it on-site at the hotel, the security interest attached to it, Minn.Stat. § 336.9–203(2), to secure Defendant's debt to Midwest Federal.

In oral argument, Defendant's counsel argued that a genuine issue of material fact prohibited summary judgment in Plaintiff's favor on this issue. As support, he noted that Defendant, in his deposition testimony, had asserted several times that he never "intended" to subject "his personal art collection" to Midwest Savings's security interest. This, counsel argued, created a triable fact issue going to the attachment of the security interest.

■ This, argument, however, is without merit; Defendant's conclusory assertions do not evidence a *genuine* issue of *material* fact. For the purposes of analysis under Rule 56, the materiality of a fact asserted to be in controversy is determined by whether the outcome of the claim or defense in question would turn on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992); *In re Mathern*, 137 B.R. 311, 322, n. 15 (Bankr. D.Minn.1992). The substantive law governing the broader controversy—usually the elements of the claim or defense at issue—establishes whether evidence of a particular fact could tip the final decision in this fashion.

The substantive law here is the provisions of Article 9 previously quoted. Minn. Stat. § 336.9–203(1) functions, in part, as something "in the nature of a Statute of Frauds." *See* Uniform Commercial Code Comment 5 to Minn.Stat. § 336.9–203. As such, it prohibits creditors from "establish[ing] a secured status" by parol evidence. *Id.* This function, however, goes only to the question of whether "a security in *something* exists." *See* 2 J. White & R. Summers, Uniform Commercial Code at 307 (3d ed. 1988). The ascertainment of the bare existence of *a* security interest is only the first part of a two-step inquiry; the second query is, "did the parties to the agreement *intend* that the property claimed should serve as collateral." *Id.* (emphasis in original). *See also In re*

*Krause,* 114 B.R. 582, 593–594 (Bankr. N.D.Ind.1988) (applying Indiana enactment of UCC § 9–203). Parol evidence may be admissible for the latter question. *In re Waters,* 90 B.R. 946, 963 (Bankr.N.D.Ia. 1988) (applying Iowa enactment of UCC § 9–203). *See also* WHITE & SUMMERS, *supra,* at 310. The materiality of parol evidence going to the parties' intent is governed by general state law on contracts. *In re Krause,* 114 B.R. at 592. If state law prohibits the use of parol evidence where the contract in question is unambiguous on its face, evidence of a debtor's intention as to the scope of collateral may not be considered where the parties' security agreement clearly describes the property to be encumbered under it. *In re Martin Grinding & Mach. Works, Inc.,* 42 B.R. 888, 891 (Bankr.N.D.Ill.1984) (applying Illinois enactment of UCC § 9–203).

■ Here, Defendant's statements of his subjective intention cannot be considered in gauging the scope of the security interest in question. Minnesota contract law adopts the general rule on parol evidence; such evidence is not admissible to alter the terms of a clear and unambiguous written contract. *Material Movers, Inc. v. Hill,* 316 N.W.2d 13, 17 (Minn.1982); *Klawitter v. Straumann,* 255 N.W.2d 407, 411 (Minn. 1977) (parol evidence may not be received to show that a contracting party meant one thing, when they agreed to another in writing); *Norwest Bank Minnesota, N.A. v. Midwestern Machinery Co.,* 481 N.W.2d 875, 881 (Minn.Ct.App.1992), and cases cited therein at § 4 under syllabus; *Apple Valley Red–E–Mix, Inc. v. Mills–Winfield Engineering Sales, Inc.,* 436 N.W.2d 121, 123 (Minn.Ct.App.1989). As noted earlier, there is no ambiguity as to the import of the language under which Defendant granted a security interest in "furnishings" attached to or placed into the hotel; nor is there as to the reference to *any* "personal property" moved into the building. Both terms clearly encompass any artwork which Defendant owned and then placed into the hotel as part of its decor. The parties' expressed intent being as unambiguous as this, Defendant's statements of a different intent, at or after the fact, have

no bearing, as a matter of substantive law. *See Lehman v. Stout,* 261 Minn. 384, 390, 112 N.W.2d 640, 644 (1961); *Karger v. Wangerin,* 230 Minn. 110, 114, 40 N.W.2d 846, 849 (1950); *Apple Valley Red–E–Mix v. Mills–Winfield Engineering Sales, Inc.,* 436 N.W.2d at 123 (all noting that parol evidence rule is principle of substantive law, not rule of evidence). All material issues of fact are laid to rest by the documents; Defendant's statements cannot create a fact dispute cognizable at trial.

Defendant has produced no other evidence bearing on the attachment of Midwest Federal's security interest to the artwork. He bore the burden of doing so, to preserve his right to a trial on fact issues relevant to that dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–252, 106 S.Ct. 2505, 2511–2512, 91 L.Ed.2d 202 (1986); *Heideman v. PFL, Inc.,* 904 F.2d 1262, 1265 (8th Cir.1990); *In re Mathern,* 137 B.R. at 314. On the established and undisputed facts, Plaintiff has shown its right to relief, as a matter of law. As a result, it is entitled to judgment on its main claim. FED.R.CIV.P. 56(c), *as incorporated by* FED.R.BANKR.P. 7056; *In re Mathern,* 137 B.R. at 315.

*B. Whether Plaintiff Relinquished its Security Interest In Whole or In Part During Its Participation in the Process of Confirmation of Defendant's Reorganization Plan.*

In his answer, Defendant set up the equitable defenses of waiver and estoppel, and the legal defenses of accord and satisfaction and *res judicata.* Plaintiff made a preemptive strike at these defenses as part of its own motion; following the lead suggested in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986), it "pointed out" that there was no extant evidence to support one or more elements of each defense, and argued that it was entitled as a matter of law to judgment in its favor on them. This, of course, shifted the burden to Defendant to produce substantial, probative evidence going to these elements, to avoid a conclusion that there was no triable

fact issue on them, and that they had to be found in Plaintiff's favor. In his cross-motion, Defendant maintains that the record of the confirmation proceedings indisputably establishes the elements of a good defense or defenses. He then asserts that he is entitled to judgment that Plaintiff is barred from claiming the ownership of the artwork by the confirmation of his plan, or, alternatively, that Plaintiff relinquished its claimed security interest and any resultant claim to ownership during the negotiation of the treatment of its claim under the plan, or during the plan confirmation process. He argues only the equitable defenses in the present motion. For the sake of completeness, however, all four pleaded defenses should be treated. With the exception of the *res judicata* defense, the governing rules of decision are all from state law.

The record presents no genuine issue as to certain material facts common to several of the defenses. For its evidentiary support, Plaintiff produced the affidavit of the attorney who represented Midwest Savings throughout the confirmation proceedings. He states as follows:

> [Plaintiff] believed, based upon statements and representations by [Defendant], that the artwork believed to be originally placed in [Defendant's] medical office was claimed to be owned personally by [Defendant]. [Plaintiff] was further led to believe that other pieces of artwork were originally placed at the [hotel] upon purchase thereof. [Plaintiff] was never informed that the artwork located at [Defendant's] medical office was originally located at the [h]otel.... [Plaintiff] did not learn until approximately September 10, 1990, that [Defendant] had secretly removed the Mark King artwork from the [hotel] after the commencement of the bankruptcy case and during the course of the discussions between [Plaintiff], [Defendant], and the [committee of] unsecured creditors.

These statements are not contradicted by the written record for the confirmation process; Defendant's Third Amended Disclosure Statement (filed on July 17, 1990) contains no specific reference to any personalty of the hotel. A footnote to the liquidation analysis attached to the disclosure statement discusses certain unidentified paintings which were part of a category of "Personal Art Objects," but it discloses nothing about the status of possible encumbrances against them. The version of the plan which was filed on the same date, and which was transmitted to creditors before the confirmation hearing, does not contain any such references either. In a supplementary affidavit, the attorney emphasizes that

> No agreement was reached between [Plaintiff] and [Defendant] and the committee of Unsecured Creditors in this case as to [Plaintiff] agreeing to release or forfeit its rights in the Mark King artwork that at any time located at the [hotel].

He also reiterates that Plaintiff did not become aware of facts suggesting that its security interest had attached to all of the artwork until after it took possession of the hotel on September 8, 1990, and that it consistently asserted that security interest at all times thereafter.

These allegations go to one fact which is "subjective" in nature—the awareness of Plaintiff's employees or agents as to the facts which could support a claim of security interest in the removed artwork—and one which is "objective," or at least provable only by objective, direct evidence—whether Plaintiff agreed to release its claimed security interest in any of the artwork. Defendant's only evidentiary response is the affidavit of James A. Bartholomew, the chief financial officer of the company which managed Defendant's business affairs before and during his Chapter 11 case. In it, Bartholomew details the lengthy process by which Defendant and the Committee negotiated on the value of the artwork. However, the affidavit contains no allegation that Defendant or the Committee ever disclosed the past situs of the removed artwork to Midwest Savings or to any other party, at any time before the confirmation hearing. As to then, it recites the terms of an "agreement," purportedly "read onto the record at the Con-

firmation Hearing," which included a recitation that Defendant had removed 16 of the 26 pieces from the hotel in early 1990.

The allegations in Bartholomew's affidavit are simply not probative of one fact issue on which several of the parties' requests for relief may turn: whether, before the confirmation hearing, Midwest Savings was on notice of facts from which it could conclude that its security interest had attached to the artwork. The only probative, substantial evidence on this point is Plaintiff's. Defendant failed to carry his burden to produce "significantly probative" evidence to rebut Plaintiff's proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–250, 106 S.Ct. at 2510–2511; *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The record, then, compels a finding in Plaintiff's favor on this point: Midwest Savings was unaware of any grounds for an assertion of a secured position in the removed artwork before the confirmation hearing. This uncontroverted fact goes to several defenses; as will be seen, other uncontroverted facts go to individual defenses.

### 1. Accord and Satisfaction.

Under Minnesota law,

[a]n accord and satisfaction acts to discharge a contract or a cause of action, and may be express or implied from circumstances which clearly and unequivocally indicate the intentions of the parties.

*Ladwig & Ladwig, Inc. v. Orlin Ladwig, Inc.,* 372 N.W.2d 408, 411 (Minn.Ct.App. 1985). *See also Shema v. Thorpe Bros.,* 240 Minn. 459, 465, 62 N.W.2d 86, 90 (1953). Defendant did not formally argue this defense for this motion. The theory, apparently, is that Plaintiff agreed before the confirmation hearing to release its security in all or part of the artwork, in favor of the class of unsecured creditors, as part of the settlement of all competing claims to the value of Defendant's nonexempt assets. The only extant evidence on this issue is Plaintiff's, and it is to the effect that Plaintiff never made such an agreement. Defendant and the Committee failed to pro-

duce *any* evidence going to the existence of such an agreement, clear and unequivocal or not. For want of such evidence, Plaintiff is entitled to judgment as a matter of law; its claim to the artwork is not barred by the doctrine of accord and satisfaction.

### 2. Res Judicata.

For the present motion, Defendant did not even refer to his pleaded *res judicata* theory either. Because of its more general nature, the import of this defense in the context of this proceeding is more obscure. Apparently, though, its gist is that the confirmation of Defendant's plan comprehensively readjusted the rights of all of Defendant's creditors, including all competing claims to the value of the artwork, and Plaintiff is now precluded from relitigating issues of fact or law to obtain any result different from the plan's allocation of that value. This defense is purely legal in nature, as its outcome turns solely on the content and/or import of the plan as confirmed.

 Under the rule in this District, all liens not expressly preserved by the terms of a reorganization plan are voided by the confirmation of that plan, and creditors are precluded from asserting or enforcing such void lien rights in later judicial proceedings. *In re Arctic Ent., Inc.,* 68 B.R. 71, 80 (D.Minn.1986); *In re Fischer,* 91 B.R. 55, 57 (Bankr.D.Minn.1988). This is so because 11 U.S.C. § 1141(c) provides, in pertinent part, that

... except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors ...

*In re Arctic Ent., Inc.,* 68 B.R. at 78–80; *In re Fischer,* 91 B.R. at 56. The confirmation order, then, operates as a binding adjudication of all parties' claims to the assets of the reorganized debtor.

This application of the preclusion doctrine, however, is unavailable to Defendant. His plan expressly preserved all of the lien rights of Midwest Savings, and expressly contemplated their full enforcement postconfirmation. *See* Para. 4.1 of Defendant's

Fourth Amended Plan of Reorganization (filed on January 28, 1991).[9] The confirmation order did not void any of the rights which Plaintiff now asserts, and it is entitled to judgment to this effect.

### 3. Waiver.

 Defendant contends that Plaintiff waived its right to assert its security interest by casting its ballot in favor of Defendant's plan, and by not objecting to confirmation "on the grounds that the proceeds of the Mark King artwork were to be paid to unsecured creditors." Under Minnesota law, waiver is "an intentional relinquishment of a known right." *Citizens Nat'l Bank of Madelia v. Mankato Implement, Inc.,* 441 N.W.2d 483, 487 (Minn.1989); *Hauenstein & Bermeister, Inc. v. Met–Fab Indust., Inc.,* 320 N.W.2d 886, 892 (Minn. 1982).

Plaintiff has established that it had no knowledge of the existence of its security interest in the removed artwork before the confirmation hearing. Up to the time of the confirmation hearing, then, it was not legally capable of waiving its rights. The question, then, is whether Plaintiff was put on notice of the true state of affairs at the confirmation hearing, and whether it then intentionally relinquished its rights. As the proponent of this defense, Defendant bears the affirmative on these fact issues.

Bartholomew's affidavit attests to the resolution of Defendant's contest with the Committee over the artwork; to the purported reading of the terms of that agreement onto the record at the confirmation hearing; and to the fact that Midwest Savings "fully participated in the hearing," and cast its ballot in favor of the plan. The only point which Defendant offers to augment Bartholomew's statements is his counsel's notation that Midwest Savings did not participate in any of the preconfirmation negotiations over the artwork. Apparently, this is asserted as circumstantial evidence for a negative inference—that Midwest Savings simply did not care to assert an interest in the removed artwork. This inference is conclusively defeated by the established fact of Midwest Savings's lack of knowledge of its lien, before the confirmation hearing. Even if that fact were not established, the circumstance of non-participation by Midwest Savings would not help Defendant to establish the inference he urges; it equally supports lack of knowledge on the part of Midwest Savings as a contrary inference. Amenable as it is to two contrary and equally-reasonable inferences, this basic evidence cannot establish an undisputed fact for the purposes of summary judgment. *In re Mathern,* 137 B.R. at 322.

The record of the confirmation hearing, then, is crucial for this defense. That record is devoid of any evidence that Midwest Savings was then put on notice of its possible security interest in the removed artwork. Contrary to Defendant's assertion, review of the lengthy record for the hearing reveals no recitation by counsel of the three-party "agreement" which Defendant asserts.[10] During the course of his testimony, Defendant acknowledged that 10 paintings were then "presently located at" the hotel, and 16 at his medical office. He attested to his wish to retain six of those at his office, and to allow the rest to be sold or to be retained by secured creditors, "depending on the situation." He also stated that, in his understanding, the balance of the paintings at his office would be sold, with their value to be deposited

---

9. This term allowed Defendant to satisfy the allowed secured claim of Midwest Savings by a payment or payments in accordance with the prior settlement agreement, and allowed Midwest Savings "to receive its foreclosure rights in accordance with" the agreement if Defendant did not make payment by a stated deadline. As noted *supra* at pp. 210–11, the Settlement Agreement (as filed on November 14, 1989) contained Defendant's unqualified acknowledgement of the security rights of Midwest Savings under the mortgage instrument.

10. In his brief, Defendant's counsel physically lays out the terms of the agreement as if it were a verbatim quote from the record, but he does not cite to a transcript, or even place the recitation into the lengthy sequence of the matters covered at the hearing. It is unclear, then, how Defendant can maintain that such a recitation was actually made; the Court shares Plaintiff's counsel's bewilderment at the assertion.

into a distribution account for the benefit of the class of unsecured creditors under his plan.[11]

This testimony was the only part of the record of the confirmation hearing which goes to the fact at issue here. Not·a bit of it was such as to put Plaintiff on notice that the removed artwork had ever been on-site at the hotel. Thus, though it rather clearly spelled out Defendant's understanding as to the proposed disposition of the artwork, it neither evidenced any agreement embodying a waiver by Midwest Savings, nor put Midwest Savings on notice of the underlying facts. In point of fact, the record of the confirmation hearing is entirely consistent with Plaintiff's fact assertion: Midwest Savings and Plaintiff did not become aware of the crucial facts until several weeks after the confirmation hearing.

The only evidence which Defendant asserts in support of this defense does not exist. On the undisputed record, and the factual findings it compels, only one conclusion is possible on the waiver defense: Plaintiff's acquiescence to the confirmation of Defendant's plan did not incorporate a relinquishment of its lien against the removed artwork. Plaintiff cannot be deemed to have waived rights of which it was not even aware. *Marso v. Mankato Clinic, Ltd.*, 278 Minn. 104, 117, 153 N.W.2d 281, 290 (1967); *Local 1142 v. United Electrical, Radio, and Machine Workers of America*, 247 Minn. 71, 77, 76 N.W.2d 481, 484 (1956) (both holding that proponent of waiver must show that party charged therewith knew of his legal right and intended to give it up). Plaintiff's claim to all of the artwork survives this

asserted defense, then, and it is entitled to judgment accordingly.

#### 4. Equitable Estoppel.

 Defendant and the Creditors Committee[12] both argue that Plaintiff is equitably estopped from asserting its security interests in the removed artwork. Under this doctrine, a party seeking to bar another party from asserting claims or defenses must prove three elements:

1. That promises or inducements were made;

2. That the invoking party reasonably relied upon the promises; and

3. That the invoking party will be harmed if estoppel is not applied.

*Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn.1990). Both defending parties assert that the Committee[13] reasonably relied to its detriment on the silence of Midwest Savings during the negotiation and confirmation processes, assuming that there were no secured claims to the artwork with which to contend. They correctly note that Minnesota law will allow the inducement element to be satisfied by silence as to a material fact, *Thorson v. Rice County District 1 Hospital*, 437 N.W.2d 410, 415 (Minn.1989), as long as the other elements of equitable estoppel are present. As a result, they argue, equity must lie to bar Plaintiff's claims to the artwork at this time.

Plaintiff counters this defense with the same evidence which it asserted for the others. ˙It points to Defendant's and the Committee's established failure to timely disclose the true facts on the status of encumbrances, and their actual or deemed

---

**11.** All of this testimony was elicited by affirmative answers to leading questions propounded by Defendant's counsel.

**12.** The Committee is not a named party to this adversary proceeding; as a result, its formal standing to participate is unclear. Nonetheless, the Court entertained its counsel's arguments and has considered his brief.

**13.** Interestingly, notwithstanding its lack of formal standing, the Committee is probably the only party with true legal standing to assert this defense. As Defendant did not have an allowable claim of exemption to the artwork, only the

Committee's constituency, and holders of secured interests in the artwork, stood to benefit from the administration of its value. Defendant participated in intense negotiations over the artwork with the Committee, but only as a stakeholder who wished to regain full right to the artwork by an accommodation with those parties entitled to it. Because the creditor-constituencies had the full claim to its value, Defendant cannot now claim to have relied to his detriment on the assumed status of encumbrances against the artwork. As a technical matter, then, he has no standing to assert this defense.

knowledge that Midwest Savings was unaware of those facts.

■ Neither Defendant nor the Committee adduced additional evidence going to any unique elements of this defense, so the facts must be taken as Plaintiff has supported them. The governing law, in turn, supports Plaintiff's preemptive attack:

> There can be no estoppel unless the parties sought to be estopped had full knowledge of the facts at the time of the conduct claimed to give rise to the estoppel.

*State ex rel. Caffrey v. Metropolitan Airports Comm.,* 310 Minn. 480, 488, 246 N.W.2d 637, 642 (1976). *See also Transamerica Ins. Group v. Paul,* 267 N.W.2d 180, 183 (Minn.1978). Whether Defendant and/or the Committee actively concealed the true state of affairs or not, equity will not lie to estop Plaintiff from asserting its security interest; it is entitled as a matter of law to judgment on this last defense as well.

### C. Whether Plaintiff Now Holds Full Ownership of the Mark King Artwork.

Though Defendant did not take issue with Plaintiff's position on one final point, some discussion is warranted if for no other reason than to link the foregoing conclusions to the ultimate grant of relief which Plaintiff requests, and to address a conclusory denial in Defendant's answer. As noted earlier at p. 210, n. 2, Defendant and Midwest Savings gave the force and effect of an Article 9 security agreement to the mortgage instrument. Plaintiff enforced its secured rights under the mortgage instrument via the foreclosure-by-advertisement procedure under MINN.STAT. §§ 580.-01, *et seq.* Under MINN.STAT. § 336.9–501(4),

> [I]f the security agreement covers both real and personal property, the secured party may proceed under this part [14] as to the personal property or may proceed as to both the real and the personal property in accordance with the secured

party's rights and remedies in respect of the real property in which case the provisions of this part do not apply.

Plaintiff, then, had the right to elect as it did here—to foreclose both its real estate mortgage and its personal property security interest under color of the mortgage-foreclosure statutes. *Lieberman Music Co. v. Hagen,* 394 N.W.2d 837, 840 (Minn. Ct.App.1986) (under MINN.STAT. § 336.9–501(4), security party has full right of election in foreclosure, to both procedure and substance). The documentary record establishes that Plaintiff complied with all of the requirements of Chapter 580; as a result, after its bid-in at the foreclosure sale, and upon the expiration of Defendant's six-month redemption period, it succeeded to Defendant's full ownership rights to all of the collateral, including the artwork. It is entitled to full declaratory and equitable relief to effectuate these rights.

### ORDER FOR JUDGMENT

Upon the Findings of Fact and Conclusions of Law in this memorandum order, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That Plaintiff's motion for summary judgment is granted.

2. That Defendant's motion for summary judgment is denied.

3. That, under color of the April 10, 1986 Mortgage and Security Agreement and Fixture Financing Statement executed by Defendant in favor of MWF Mortgage Corporation, a security interest attached to 26 paintings and/or other examples of artwork executed by one Mark King, when Defendant placed them onto the premises of the Holiday Inn Minneapolis West, St. Louis Park, Minnesota, after he acquired them in 1986–87.

4. That Plaintiff has succeeded to all of the rights of the secured party holding the security interest against the artwork described in Term 3 hereof.

5. That, as a result of the completed foreclosure of its security interest against

---

**14.** This reference is, of course, to Part 5 of Article 9, which governs a secured party's default remedies against personal property collateral.

the artwork described in Term 3 hereof, Plaintiff holds full and unqualified ownership of all of that artwork, and is entitled to recover it and/or its value from the persons or entities which presently hold it.

6. That the doctrines of accord and satisfaction, *res judicata*, waiver, and equitable estoppel do not bar Plaintiff from asserting its security and ownership rights in the artwork, or from recovering the artwork or its value at the present time.

7. That, as to all of the artwork described in Term 3 hereof which was not onsite at the Holiday Inn Minneapolis West as of September 8, 1990, Defendant and the disbursing agent under his confirmed plan of reorganization shall account to Plaintiff for it or its value as follows:

a. Defendant and the disbursing agent shall turn over to Plaintiff all such artwork which is currently in their possession, as to which Defendant has not fully exercised his buyback rights under his confirmed plan.

b. Defendant and the disbursing agent shall turn over to Plaintiff a sum of money equal to the proceeds from all artwork which the disbursing agent has sold to third parties, or as to which Defendant has fully exercised his buyback rights.

Defendant and the disbursing agent shall comply with these turnover obligations within a reasonable time, not to exceed 30 days. If they do not, Plaintiff may apply to this Court for entry of a supplemental money judgment in an appropriate amount, and shall fully evidence and support the amount requested by affidavit.

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERMS 3 THROUGH 7 OF THIS ORDER.