**In re: Herbert G. GIBSON, Debtor.**

**SNYDERGENERAL CORPORATION, a Minnesota corporation, Plaintiff,**

v.

**Herbert G. GIBSON, Defendant and Third Party Plaintiff,**

v.

**Byron STARNS, Jann M. Eichler–Smith and Leonard, Street and Deinard, Third Party Defendants.**

**Bankruptcy No. 3–91–3444.**
**Adv. No. 3–91–300.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Jan. 20, 1993.

John F. Stockman, Richfield, MN, for defendant.

Douglas B. Greenswag, Leonard, Street and Deinard, Minneapolis, MN, for plaintiff.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge,

This adversary proceeding came on before the Court on November 3, 1992, for hearing on Plaintiff's motion for summary judgment. Plaintiff appeared by its attorney, Douglas B. Greenswag. Defendant appeared by his attorney, John F. Stockman. Upon the moving and responsive documents, the briefs and arguments of counsel, and the other files, records, and proceedings in this adversary proceeding, the Court grants the motion.

## I. PROCEDURAL BACKGROUND

Defendant is a debtor under Chapter 7 in a case commenced in this Court by his voluntary petition. At all relevant times, he was the President of Pacesetter Heating Supply, Inc. ("Pacesetter"), a Minnesota corporation, and the holder of 50 percent of the outstanding shares in it.

Plaintiff is an international manufacturer of heating and air conditioning equipment. Pacesetter was a regional distributor of Plaintiff's products, under a July 8, 1987 distributorship agreement. Defendant personally guaranteed all of Pacesetter's obligations to Plaintiff. On June 2, 1989, Plaintiff formally terminated Pacesetter's distributorship pursuant to the agreement.

In May, 1989, Plaintiff had sued Defendant, Pacesetter, Defendant's father and brother, another individual, and several other corporations owned by and/or related to the other defendants. The lawsuit was venued in the Minnesota State District Court for the Fourth Judicial District, Hennepin County. As finally set forth in its second amended complaint, Plaintiff alleged that Defendant and Pacesetter were indebted to it for a sum in excess of $1,000,000.00, on account of credit extended and inventory furnished to Pacesetter at

Defendant's request. It specifically pleaded the theory of common-law fraud, alleging that Defendant and Pacesetter had knowingly and materially misrepresented Pacesetter's financial condition to induce Plaintiff to increase Pacesetter's credit limit, to continue to grant Pacesetter credit, and to continue to provide Pacesetter with inventory. Under the same theory, and under the Minnesota enactment of the Uniform Fraudulent Transfer Act, Plaintiff alleged that Defendant and Pacesetter had transferred significant assets of Pacesetter to Wild River Ducts ("WRD"), one of the related-company defendants, that was owned and controlled by Defendant's father. It alleged that these transfers were made for inadequate consideration, and with actual intent to defraud Pacesetter's creditors. It also alleged that the making of them left Pacesetter with inadequate capital to carry on business.

Defendant answered jointly with Pacesetter. They generally denied the allegations of fraud and fraudulent transfer, and interposed certain affirmative defenses. They also counterclaimed against Plaintiff for contribution or indemnification on a pending crossclaim against Defendant by two of his co-defendants.

The litigation went on over the next 18 months. Defendant's counsel withdrew, with Defendant's consent, during its latter stages; Defendant proceeded *pro se*. In January, 1991, the Hennepin County District Court (Johnston, J.) set the lawsuit for trial for a date certain, to commence June 24, 1991.

Without prior notice to Plaintiff or its counsel, Defendant filed his bankruptcy petition at 12:16 p.m. on June 20, 1991. On June 21, 1991, Plaintiff served a motion for relief from stay on Defendant's bankruptcy counsel by messenger delivery. The hearing on the motion was set for 9:30 a.m. on Tuesday, June 25, 1991.

On Monday, June 24, 1991, Judge Johnston convened the trial. Defendant appeared, under subpoena from Plaintiff. Plaintiff's counsel disclosed that Defendant had filed for relief in this Court, as had his brother. Plaintiff's counsel acknowledged

that he understood that Defendant was not making a formal appearance and was present only in response to the subpoena. Judge Johnston then noted:

> So essentially we have three defendants, Wild River Ducts, Midwest Ducts, Comfort Sales and as an individual [sic] Herbert R. Gibson and Ricky Anderson?

*SnyderGeneral Corporation v. Pacesetter Heating Supply, Inc., et al,* Court File No. 89–08597, Transcript of Trial at 4 (Minn. State D.Ct., 4th Jud.Dist. June 24, 1991) ("State Court Trial Tr."). Plaintiff's counsel acknowledged that and, immediately, noted:

> As I informed the Court we have moved for expedited motion [sic] to remove the bankruptcy stay involving Herbert G. Gibson and Pacesetter. That will be heard tomorrow morning and the stay may be lifted with respect to them tomorrow morning.

State Court Trial Tr. at 4–5. Judge Johnston then asked Plaintiff's counsel what the stay motion "would do for" him. Counsel answered that he thought it would enable Plaintiff to proceed against Defendant on both its fraud and contract claims. Judge Johnston had no further comment on Defendant's status, and directed the start of the trial. State Court Trial Tr. at 5.

Defendant remained in the courtroom at the trial through sometime in the afternoon of Monday, June 24th. He then left, not returning until the morning of Wednesday, June 26th.

This Court called for hearing on Plaintiff's motion for relief from stay on June 25, as scheduled. Defendant's bankruptcy counsel appeared and argued in opposition to the motion. This Court concluded that, in light of recent decisions by the Supreme Court and the Eighth Circuit Court of Appeals, a grant of relief from stay was supported by judicial economy, considerations of fairness, and due deference to the parties' respective investments in the state court litigation. Thus, it granted the motion, and entered an order immediately after the hearing. The grant of the motion was explicitly "without prejudice to the bringing of a dischargeability adversary

proceeding and without prejudice to any arguments on a motion for summary judgment in the adversary proceeding by either party ..." *In re Herbert G. Gibson,* BKY 3–91–344, Transcript of Hearing on Motion of SnyderGeneral Corp. for Relief from Stay, at 20 (Bankr.D.Minn. June 25, 1991).

When Defendant returned to the state court trial the following morning, he told Judge Johnston he had done so because his bankruptcy counsel had told him he had to appear in his own defense. State Court Trial Tr. at 356. When questioned by Judge Johnston as to his presence, he acknowledged he was aware of the grant of relief from stay. *Id.* Sometime later that day, Judge Johnston again inquired of Defendant about his conduct and awareness during the litigation. Defendant advised him that he had received the order for trial, had been aware that the matter had been set for trial to commence on June 24, and had intended to represent himself after he had released his attorney. State Court Trial Tr. at 385–386. He stated that he had believed on the basis of his bankruptcy counsel's advice that his bankruptcy filing "brought the matter" of Plaintiff's suit against him "into the bankruptcy court and the bankruptcy court [would] make ... a determination on it." State Court Trial Tr. at 387–388. He stated he had discussed the state court lawsuit with his bankruptcy counsel, and that he knew that his bankruptcy counsel had represented him at the hearing before this court. *Id.* He acknowledged that he now understood that the issues that the state court decided could be considered later by this Court, State Court Tr. at 389–390, and that the state court's findings could affect whether any adjudged liability of his to Plaintiff would survive bankruptcy, *id.* at 391–392. After some further colloquy, in which Judge Johnston expressed some concern over how an appellate court would view the way in which the trial had gone forward, the parties went ahead with further evidence.

When the trial reconvened the following week after a weekend recess, Defendant made an oral motion that he styled as one

"for a mistrial." To support the motion, he argued that he had been prejudiced when evidence had been received while he was "protected by the automatic stay of the bankruptcy court." State Court Trial Tr. at II–A–4. In response, Plaintiff's counsel noted that Defendant had been present for substantial amounts of the testimony. As to evidence received in Defendant's absence, counsel noted that Defendant could recall witnesses as part of his own case without objection by Plaintiff. State Court Trial Tr. at II–A–6. He then offered to have his client pay for the preparation of transcripts of the testimony taken in Defendant's absence, if required by the court upon Defendant's showing of need therefor. *Id.* at II–A–8. Finally, he argued in the alternative that Defendant had not been prejudiced, that Defendant was responsible for any prejudice he suffered, and that any prejudice was remediable. State Court Trial Tr. at II–A–9–10.

Defendant did not respond with further argument or any request. Judge Johnston ultimately concluded that Defendant had undertaken the risk of prejudice by his actions on June 24 and 25. He denied the motion for "mistrial." State Court Trial Tr. at II–A–12–13. The trial then went forward and concluded, after seven-plus days of evidence and argument.

Judge Johnston took the issues under advisement. On January 16, 1992, he issued a 60–page decision, consisting of 314 numbered findings of fact and 13 numbered conclusions of law. As to Defendant, he specifically concluded:

> Herbert G. Gibson defrauded SnyderGeneral by the intentional concealment, misrepresentation and failure to disclose his transfer of Pacesetter funds to WRD

and WRD's vendors. Herbert G. Gibson also defrauded SnyderGeneral by the intentional misrepresentation of Pacesetter's accounts receivable balance and net worth. Damages attributable to these acts of fraud total Pacesetter's outstanding balance of $1,038,036.02.

*SnyderGeneral Corporation v. Pacesetter Heating Supply, Inc., et al,* Court File No. 89–08597, Findings of Facts, Conclusions of Law and Order for Judgment at 58 (Minn. State D.Ct., 4th Jud.Dist. January 16, 1992). This conclusion was fully supported by numerous findings of fact in Judge Johnston's treatment of the fraud count of Plaintiff's complaint. Accordingly, he ordered judgment in favor of Plaintiff and against Defendant in the sum of $1,038,-036.02 plus interest. After Judge Johnston denied Defendant's alternative post-trial motions for amended findings of fact and conclusions of law or for a new trial, judgment was entered on May 20, 1992.

Defendant timely appealed from the judgment. He did not post a supersedeas bond. Oral argument was scheduled by the Minnesota Court of Appeals for November 19, 1992. Via an unpublished opinion filed on January 19, 1993, the Minnesota Court of Appeals affirmed the trial court's judgment in its entirety.

## II. DISCUSSION

In this adversary proceeding, Plaintiff seeks a determination that Defendant's debt to it was excepted from his discharge in bankruptcy. It relies on 11 U.S.C. §§ 523(a)(2)(A)–(B).[1]

Plaintiff now moves for summary judgment on both theories. It maintains that all fact issues necessary to support a determination of nondischargeability were final-

---

1. These statutes provide:
 (a) A discharge under [11 U.S.C. §] 727 ... does not discharge an individual debtor from any debt—

 . . . . .

 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive ...

ly adjudicated in the Hennepin County District Court, and that the doctrine of collateral estoppel now bars Defendant from relitigating those issues. Under Plaintiff's theory, Judge Johnston's findings would be deemed to be undisputed for the purposes of this proceeding. Plaintiff argues that these findings meet all of the elements of a nondischargeable debt under both of the Bankruptcy Code sections that it invokes and, accordingly, it is entitled to judgment as a matter of law. Defendant resists the motion on a number of different grounds, all but one going to the applicability of collateral estoppel.[2]

## A. COLLATERAL ESTOPPEL

■ To merit the bar of collateral estoppel on the basis of an adjudication in a prior court proceeding, the proponent must demonstrate the existence of four elements:

1. The fact issue to which the doctrine is to be applied must be the same as one involved in the prior proceeding;
2. The issue must have been litigated in the prior proceeding;
3. The issue must have been determined by a valid and final judgment; and
4. The adjudication must have been essential to the prior judgment.

*In re Miera,* 926 F.2d 741, 743 (8th Cir. 1991); *Lovell v. Mixon,* 719 F.2d 1373, 1376 (8th Cir.1983). "[C]ollateral estoppel principles ... apply in discharge exception proceedings pursuant to [11 U.S.C.] § 523(a)." *Grogan v. Garner,* 498 U.S. 279, —— n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755

(1991). Where the elements of a state-law cause of action for fraud are identical to the elements for an exception to discharge under § 523(a)(2), *id.* at ——, 111 S.Ct. at 658–659, the application of collateral estoppel "will permit exception from discharge of ... fraud claims creditors have successfully reduced to judgment," *id.* at ——, 111 S.Ct. at 661.

Since Defendant's counsel challenges Plaintiff on every single element of collateral estoppel, some discussion of each is appropriate.

### 1. Identity of Issues.

■ A creditor seeking to have a debt found nondischargeable under 11 U.S.C. § 523(a)(2)(A) must prove five elements:

1. That the debtor made false representations;
2. That the debtor knew the representations to be false at the time the debtor made them;
3. That the debtor made the representations with the intention and purpose of deceiving the creditor;
4. That the creditor actually relied on the debtor's representations;
5. That the creditor sustained the alleged injury as the proximate result of the making of the representations.

*In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987), as modified by *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987).[3]

The text of 11 U.S.C. § 523(a)(2)(B) itself sets forth the specific elements of a nondischargeable debt under that section. Other than the statutory requirement that a cred-

---

**2.** Defendant also has filed his own affidavit for this motion. In it, he attests in a conclusory fashion to the issues of knowledge, intent, and reliance on which Judge Johnston made findings. He summarily denies all of the findings that were contrary to his positions. As Plaintiff's counsel correctly notes, this affidavit is only so much surplusage, irrelevant to the summary judgment inquiry that is structured by Plaintiff's motion. To establish a lack of triable fact issues, Plaintiff exclusively relies on the state court's decision and its alleged preclusive effect. If the state court decision does not have preclusive effect, Plaintiff's motion fails for want of any other proof going to the factual basis for its complaint. In such a case, Defendant would not even need to produce countering proof to avoid a grant of summary judgment. On the other hand, if the decision pre-

cludes Defendant from obtaining a second adjudication on the issues in question, Defendant is bound by its findings and the statements in his affidavit no longer have any bearing on the existence or nonexistence of the facts in question.

**3.** In *Van Horne,* the Eighth Circuit adopted a formulation of the reliance element which included the qualifying modifier "reasonably," without discussing the propriety of the qualification. About a month later, in *Ophaug,* a different panel of the Eighth Circuit expressly declined to overlay a reasonableness requirement, and held that the statutory language required the complaining creditor to prove only *actual* reliance to satisfy the element. 827 F.2d at 343.

itor's reliance be reasonable, the statutory elements of § 523(a)(2)(B) are analogs to the judicially-construed elements of § 523(a)(2)(A). The two sections, however, are mutually exclusive. *In re Ophaug,* 827 F.2d at 342–343; *In re Long,* 774 F.2d 875, 877 n. 1 (8th Cir.1985). Section 523(a)(2)(B) applies to *written* statements *of financial condition;* § 523(a)(2)(A) applies to *oral* misrepresentations, or those communicated *by conduct,* and the subject matter of the statement is not limited to financial condition. *See In re Long,* 774 F.2d at 877, n. 1.

In its state-law theory of recovery against Defendant, Plaintiff isolated two overlapping sequences of alleged misrepresentations for the basis of its fraud claims. Most of the misrepresentations were embodied in Pacesetter's monthly and year-end financial statements for calendar years 1987 and 1988. Defendant provided Plaintiff with both internal and audited financial statements. He did this pursuant to the distributorship agreement, in connection with Pacesetter's regular use of its revolving line of credit and with Defendant's several requests for increases of its borrowing ability on that line during 1988–89. The first alleged misrepresentations went to Pacesetter's transfer of approximately $164,000.00 in assets and cash to WRD during 1987 and 1988. These transfers reduced Pacesetter's net worth to a negative one. Defendant and Pacesetter failed to disclose them to Plaintiff, on any of the financial statements for either year or by any other means. The second set of misrepresentations went to the existence and validity of substantial accounts receivable in favor of WRD and the other related-company defendants. Entries for these re-ceivables appeared on Pacesetter's 1988 internal and audited financial statements; however, the purported accounts were not in fact valid, enforceable receivables resulting from actual sales, at any time. These omissions and misstatements, Plaintiff argued, made the financial statements materially false. It relied on this falsity, as well as verbal representations that Defendant made to Plaintiff's sales representatives, to satisfy several elements of its common-law fraud claims against Defendant and Pacesetter.

In his written decision, Judge Johnston treated all of the elements of fraud under Minnesota common law.[4] He found that Pacesetter's monthly and year-end financial statements for 1987–88 contained materially false representations about its financial condition, by failing to disclose the transfers to WRD and other transactions with WRD in 1987–88, Finding of Fact 203, and in representing that Pacesetter had substantial accounts receivable from the related-company defendants when the line-entries for these transactions on Pacesetter's books were based only on pre-season orders which were not scheduled for shipment until three to four months after the date of the 1988 financial statement, and which were never consummated as sales, Findings of Fact 242–276. Defendant had personally created the book entries in question. Finding of Fact 38. The 1988 financial statement showed a positive net worth, when in fact Pacesetter had a substantial net worth and was insolvent. Finding of Fact 41.

Judge Johnston found that Defendant knew the representations in the financial

---

**4.** The Minnesota appellate courts have limned *these elements in varying numbers, but at base* they consist of:
 1. The making of a representation,
 2. that is false,
 3. and deals with a past or present fact,
 4. that is material,
 5. and susceptible of knowledge.
 6. The representing party must have known of the falsity or have asserted the representation as of his own knowledge without knowing whether it is true or false,
 7. and have intended to induce the other party to act on the representation.

 8. The other party must have been so induced,
 9. and acted on the representation,
 10. and suffered damage,
 11. as a proximate cause of the misrepresentation.

*Davis v. Re–Trac Mfg. Corp.,* 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967). *See also Hanson v. Ford Motor Co.,* 278 F.2d 586, 591 (8th Cir. 1960) (summarizing Minnesota law on elements of fraud).

statements were false, Finding of Fact 215, because he kept Pacesetter's books and records, Finding of Fact 68, and knew the true state of affairs on the line-entries in question, Finding of Fact 290. He found that Plaintiff relied on Defendant's promise to furnish 1987 and 1988 year-end financial statements for Pacesetter when it maintained Pacesetter's credit limits in early 1988, Finding of Fact 223, and late in 1988, Finding of Fact 225. He found further reliance in Plaintiff's significant increase of Pacesetter's credit limit in March, 1988, Finding of Fact 224, and in January, 1989, Finding of Fact 226. He specifically concluded that this reliance was reasonable. Finding of Fact 234.

Finally, he found that Plaintiff sustained injury as a proximate result of the material misrepresentations in the financial statements: Plaintiff continued to increase Pacesetter's credit limit, and continued to ship inventory to Pacesetter up to and beyond that limit, Finding of Fact 235, resulting in the accrual of a net balance of $1,038,-036.02 on Pacesetter's account with Plaintiff, all of it accrued via inventory orders placed after Defendant gave the false financial statements, Finding of Fact 236. He found proximate causation in several facts. First, in reliance on the oral representations and the financial statements, Plaintiff continued to ship inventory in 1988–89 to Pacesetter even though it had met its credit limit and was having difficulties in keeping its account current. Findings of Fact 25 and 26. Second, had Plaintiff been aware of the true state of affairs for 1987–88, it would not have increased Pacesetter's credit limits, Finding of Fact 239, and would have set repayment terms requiring an ongoing reduction of the principal balance of the account, as well as payment in full of current invoices, Finding of Fact 238. Finally, had the 1988 financial statement candidly shown Pacesetter's true, net worth, Plaintiff would have discontinued shipments of inventory to it. Findings of Fact 310–314.

Judge Johnston also found other material misrepresentations by Defendant. He found that in May, 1989, as the parties' relationship was foundering, Defendant stated to Plaintiff's employees on four different occasions that a check to pay for a concurrent shipment was in the mail to Plaintiff. Finding of Fact 64. He found that Plaintiff made the four shipments in reliance on these representations, *id.*, and that Pacesetter's bank dishonored all four checks, Finding of Fact 65. Defendant knew that Pacesetter's account did not have sufficient funds to cover these checks. Finding of Fact 68. By falsely representing that Pacesetter was paying by check for each shipment as it was made, Defendant obtained further credit for Pacesetter from Plaintiff. Finding of Fact 67. He concluded that this sequence of events constituted the obtaining of credit by false pretenses, false representations, and actual fraud. Findings of Fact 68.

Finally, he found other, oral representations, repeated by Defendant throughout 1987–1989, all creating a false impression that Pacesetter was successful and financially sound: that Pacesetter's sales were growing, at a rate that would permit it to keep current on its account as long as it made certain internal changes in operations, Finding of Fact 26; and that Pacesetter had "experienced another fantastic year" in 1988, Findings of Fact 218 and 226. He found that Plaintiff's employees relied on these representations, as well, in maintaining and increasing Pacesetter's credit limit. Findings of Fact 226.

In his argument at bar, Defendant does not contest the sufficiency of these findings to meet the recognized first, second, fourth, and fifth elements of a nondischargeable debt under § 523(a)(2)(A), or the first four statutory elements of § 523(a)(2)(B). Stating "[i]n the present issue of dischargeability of the subject debt, the underlying issue of INTENT [sic] is controlling," his counsel attacks the adequacy of Judge Johnston's findings to meet this single element.

On that issue, Judge Johnston inferred that Defendant had harbored an intent to induce Plaintiff to rely on the 1987–88 financial statements, Finding of Fact 221, and that this amounted to an intent to deceive Plaintiff as to the true status of

Pacesetter's finances, in order to obtain renewals and extensions of the credit limit, Finding of Fact 222. *See also* Finding of Fact 303. He made this inference from a large number of underlying basic facts:

1. Defendant admitted that he personally had created the entries for the false receivables on Pacesetter's books. Finding of Fact 38.

2. Defendant submitted the financial statements "in an attempt to continually renew and extend Pacesetter's credit limit ..." Finding of Fact 201.

3. Defendant submitted the financial statements for the specific purpose of supporting his two requests for major increases in Pacesetter's credit limits. Findings of Fact 216–218.

4. Defendant knew that Plaintiff's employees would rely on the financial statements in passing on his requests. Finding of Fact 220. With that knowledge, he failed to inform Pacesetter's outside auditors of the transfer of Pacesetter's funds, *id.*, as well as a series of "many unusual transactions" on Pacesetter's general ledger, Findings of Fact 113–114, 116, 119, and 187. The latter apparently represented Pacesetter's purported purchase of WRD from Defendant's father, a transaction that was later reversed for no consideration. Findings of Fact 44–51. This failure to disclose directly violated a Management Representation Letter that Defendant gave on behalf of Pacesetter to the auditors, in which he certified the inclusiveness of all source documents furnished to them. Findings of Fact 113, 119, and 191–192.

5. Defendant knew that Pacesetter's auditors would rely on Pacesetter's internally-generated invoices and packing slips, and accounts receivable confirmation letters from its vendees. Finding of Fact 302.

6. After falsely recording the related companies' pre-season orders for 1989 as 1988 sales, Finding of Fact 293, and inducing principals of the related companies to sign letters that wrongly confirmed these false accounts receivable, Findings of Fact 264–266, Defendant gave a second Management Representation Letter to Pacesetter's auditors, stating "there are no material transactions that have not been properly reflected" in the source documents and the financial statements which were prepared from them, Finding of Fact 294.

7. Defendant told Pacesetter's general manager not to disclose Pacesetter's purported purchase of WRD to Plaintiff's employees. Finding of Fact 122.

8. WRD did not disclose its receipt of Pacesetter's funds on its own 1987–88 monthly and year-end financial statements. Findings of Fact 125–126, or by any other means during the period from July 1987 through June 1989, Finding of Fact 121. In their respective financial statements, income tax returns, corporate records, and internal financial records, and in the instruments and documents which purported to accomplish the transfers in Pacesetter's acquisition of WRD and Pacesetter's later relinquishment of it, Pacesetter and WRD took greatly inconsistent positions about the nature and extent of the transfer, and the occurrence and nature of the acquisition. Findings of Fact 127–148.

9. Finally, at a May 1989 meeting, Defendant admitted to employees of Plaintiff that "there had been some fraud" relating to the transactions involving Pacesetter and WRD, Finding of Fact 150, and that receivable entries on Pacesetter's books that purported to represent transactions valued at approximately $550,000.00 were false, Finding of Fact 295.

These basic facts, and the resulting inference, had their corollary in a conclusion of law: that Defendant had defrauded Plaintiff by the "intentional concealment, misrepresentation and failure to disclose" the transfer of Pacesetter funds to WRD, and the "intentional misrepresentation of Pacesetter's accounts receivable balance and net worth." Conclusion of Law 7.

 Tangentially noting that "there is a strong need for the Bankruptcy Court to

examine the issues relative to dischargeability,"[5] Defendant's counsel maintains that these findings and conclusions did not address the same issue that is before this Court. The argument is utterly without merit. Counsel's citation to *In re Miera*, 926 F.2d 741, 744 (8th Cir.1991) is inapposite. Though the *Miera* court did note that the sort of conduct which was the subject of dischargeability proceeding before it had to be "targeted at the creditor," 926 F.2d at 744 (citing *In re Long*, 774 F.2d 875, 880–881 (8th Cir.1985)), the court was applying a different statute—11 U.S.C. § 523(a)(6). That statute requires the complaining creditor to prove that a debtor acted both "willfully" and "maliciously" in inflicting an injury on the complaining creditor. *In re Long*, 774 F.2d at 880–881. As noted earlier, the complaining creditor in a proceeding under § 523(a)(2)(A)–(B) must prove a different sort of intent on the part of the debtor: that the debtor intended to "deceive" the creditor. Proof of hatred, malice, or ill will toward the creditor, or a deliberate intent to inflict specific harm on the creditor is not necessary under § 523(a)(2). For dischargeability purposes, the intent to deceive consists of the intent to induce a creditor to rely and act upon the misrepresentation(s) in question. *See, e.g., In re Burgstaler*, 58 B.R. 508, 515 (Bankr.D.Minn.1985); *In re Pommerer*, 10 B.R. 935, 939 (Bankr.D.Minn.1981) (both

noting that fraudulent intent under § 523(a)(2) equates to "deceit, artifice or trick which involves a direct and active operation of intellect which is designed to mislead").

This is precisely the intent that Judge Johnston found Defendant had harbored in making his material misrepresentations to Plaintiff, both oral and written. *Cf. Schwartz v. Renville Farmers Co-op Credit Union*, 44 B.R. 266, 267–268 (D.Minn. 1984); *In re Carothers*, 22 B.R. 114, 120 (Bankr.D.Minn.1982) (both holding that state court fraud judgment under Minnesota common law allowing recovery for negligent misrepresentation does not trigger collateral estoppel in dischargeability proceeding). There is, then, an identity of issues on the only substantive element as to which Defendant raises a controversy for this motion. Plaintiff has established the first element of collateral estoppel.

2. Actuality of Litigation of Issues.

While tacitly acknowledging that Plaintiff put all of the fact issues into suit in the state court and afforded him full opportunity to conduct discovery on them, Defendant nonetheless denies that these issues were "actually litigated." He bases this assertion on the events of the first three days of the trial—specifically, the acknowledgement by Plaintiff's counsel that Defendant was protected by the automatic stay in bankruptcy on the first day; the election

---

**5.** This is so in a sense, but not in the one urged by Defendant. The Bankruptcy Court has exclusive jurisdiction to determine the dischargeability of debt. *See* 11 U.S.C. § 523(c); 28 U.S.C. §§ 1334(b) and 157(b)(2)(I). This does not mean that every last fact issue bearing on dischargeability must be litigated, tried, and decided there, however. As noted earlier, in *Grogan v. Garner,* decided over five months before the trial in the state-court lawsuit at issue here, the Supreme Court held that ". . . collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to [11 U.S.C.] § 523(a)." 498 U.S. at ——, n. 11, 111 S.Ct. at 658, n. 11. As a result, the Bankruptcy Court could properly give collateral estoppel effect to those elements of [a creditor's state-law] claim that are identical to the elements required for [an exception to] discharge and which were actually litigated and determined in [a] prior action [in state court]. 498 U.S. at ——, 111 S.Ct. at 658. In so holding, the Supreme Court made several things quite

clear. First, given the standard of proof to be applied, the Bankruptcy Courts may not perfunctorily reject creditors that rely on prior state-court judgments to invoke collateral estoppel in dischargeability proceedings. Second, as a corollary, debtors defending such proceedings have no recognized right to the relitigation, retrial, and renewed decision on issues of fact that are common to the Bankruptcy Court proceedings and prior state-court actions. These precepts may, indeed, evince a significant change of tone from that set in *Brown v. Felsen,* 442 U.S. 127, 139, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979). They also fly in the face of much prior caselaw under the Bankruptcy Code, from all levels of the federal courts below the Supreme Court. They are, however, unmistakable. Prospective debtors who ignore pre-bankruptcy proceedings for the liquidation of debts which may be excepted from discharge, do so at great risk to their options for the defense of dischargeability proceedings.

by Plaintiff and its counsel to proceed in adducing evidence throughout that day; Plaintiff's seeking and obtaining relief from stay from this Court the following day; and the invocation by Plaintiff and its counsel of the right to judgment against Defendant based on all of the evidence adduced throughout the trial, including that introduced before Defendant's belated reappearance. As Defendant's counsel would have it, Plaintiff's reliance on evidence introduced during his client's absence amounted to a violation of the automatic stay of 11 U.S.C. § 362(a)(1)[6] and of his client's right to due process of law. Under this theory, Defendant's counsel maintains, "the first two days of the trial were ... void and without effect," as a violation of the stay; because "[e]vidence which was critical to [Plaintiff's] fraud claims against Pacesetter and [Defendant] was presented" during those days, and because "[n]o other credible or sufficient evidence on the matters was presented after the Automatic Stay was lifted," "the key evidence in support of Plaintiff's fraud claims for all intents and purposes was not presented."

To start, the argument glosses over an aspect of the events which has its origin in a technical point of law, to the end that the imputed prejudice to Defendant is incorrectly doubled. This Court entered its order granting Plaintiff relief from stay at approximately 10:05 a.m. on Tuesday, June 25th. Even assuming the merits of Defendant's theory, he was not legally or factually prejudiced by the introduction of any evidence from that instant forth; Plaintiff unquestionably was free to proceed against

him, as it did. If Defendant was not poised to take up his defense in the state court in such an event, whether under advice of his bankruptcy counsel or not, it is no fault of Plaintiff's or its counsel's.

The focus narrows, then, to about a day's worth of evidence, that introduced between Monday morning and mid-morning on Tuesday. To be sure, Plaintiff neither sought nor obtained an annulment of the stay in so many words; this Court's order did not explicitly ratify Plaintiff's counsel's prior introduction of evidence, and expressly preserved it. On the other hand, the order did not bar Plaintiff from invoking the record already made, to whatever effect; nor did it mandate a recommencement of the trial. Plaintiff's counsel was free to rely on the prior record, subject to any objection that Defendant might make later in the state court or here. One such objection, of course, is the one raised now: that any receipt of evidence during the time Defendant was still under this Court's protection should be considered as void.[7] If it is, of course, some doubt is cast on the legal tenability of the resultant decision.

Once his client was freed of the stay, counsel gave Defendant a number of options to ensure that he would have a full and fair opportunity to test the evidence that had been received while the stay was still in effect. Since the parties tried the matter to the court, rather than to a jury, there was no prejudice inherent in the possibility that Defendant might cross-examine previously-called witnesses out of turn, that evidence would have come in out of a

---

6. In pertinent part, this statute provides that the filing of a bankruptcy petition

 operates as a stay, applicable to all entities, of—
 (1) the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code] ...

7. Defendant's counsel cites several decisions for the proposition that acts in violation of the automatic stay, intentional or only technical,

are void. He does not mention published authority on the issue from this District: *Landmark v. Schaefbauer*, 41 B.R. 766 (Bankr. D.Minn.1984) (Kishel, J.) and *In re Victoria Grain Co. of Mpls.*, 45 B.R. 2 (Bankr.D.Minn. 1984) (Kressel, J.) While the undersigned noted in *Landmark v. Schaefbauer* that an act in violation of the stay is a "nullity," Judge Kressel adopted a more precise and accurate formulation in *Victoria Grain Co.*: such acts are *voidable*, but not *void per se*. Thus, the present analysis will proceed on the theory that the Bankruptcy Court may decline to avoid a technical violation of the stay, in an appropriate case.

chronological or historical sequence, that the finder of fact would have given attention to less than all of the evidence bearing on a point in controversy, or that the fact-finding process would have been subject to confusion or inconsistency in any other way. It is clear from the length, detail, and precision of Judge Johnston's findings that he took very careful note of all of the evidence adduced, weighed all of it, and made his findings only after a full evaluation of the merits.

Plaintiff's counsel, obviously, was chagrined at the situation that had resulted from Defendant's unannounced bankruptcy filing. However, he went ahead to try to protect his client's big investment in the preparation of its case for trial, at the same time exercising full caution to recognize Defendant's status in this Court. To try to reconcile these conflicting dictates, he was willing to saddle his firm or his client with further work and expense, just to ensure that Defendant had his opportunity to challenge the evidence received on June 24th. If Defendant failed to take advantage of the opportunity, no blame can be laid at counsel's or his client's feet.

Nor, from the present vantage point, can Plaintiff's basic tactical election be condemned. Defendant knowingly and deliberately created conditions which could have greatly increased Plaintiff's cost to vindicate its claim against him. The bankruptcy filing on the very eve of trial presented Plaintiff with three or four options, none of them very palatable. It could have sought a continuance of the whole state-court trial, at the risk of six months' to a year's delay under the "block assignment" system presently used in Hennepin County District Court. It could have gone ahead against the remaining defendants there and pursued Defendant in this Court, requiring another full round of litigation and trial, and possibly doubling its attorney fees and expenses of suit. It could have elected to not pursue Defendant in either forum, allowing the party who was clearly the main agent in its million-dollar loss to escape all accountability. Or, it could have done what it did.

■ Plaintiff did not purport to be pursuing Defendant during the day in question, but its counsel knew it would need the benefit of the evidence introduced then, if it were granted leave to do so. This Court allowed it to do so but reserved the issue of whether any resultant judgment would be viable in the light of the uncertain status of evidence received while the § 362 stay was in effect. As counsel finally proceeded, one can conclude that the judgment is viable. Defendant had every meaningful opportunity to make his case on the evidence that came in on the day in question. When Plaintiff eventually invoked that evidence, it was free from the strictures of the bankruptcy stay. Any taint that the days' evidence in question bore from its introduction while Defendant was under bankruptcy protection was purged by the corrective measures that counsel offered.[8]

In short, there is nothing in the letter or spirit of the Bankruptcy Code's automatic stay provisions which would support a "voiding" of the trial record made before the stay was lifted. At no time during the day in question did Plaintiff's counsel ever purport to be acting to fix or liquidate liability in Defendant. At all times, counsel was candid with the state court and Defendant about Plaintiff's intention to proceed against Defendant as soon as it was able, if this Court granted leave. Once the stay was lifted, Plaintiff was able to proceed as it deemed appropriate. It did so in a fashion so as to obviate the likelihood of prejudice to Defendant, given the mode of adjudication which the parties had elected. Defendant had been fully on notice of the possibility that he might yet have to defend himself. In view of this, he cannot credibly claim that according preclusive effect to the judgment would deny a valuable benefit of his status as a petitioner in bankruptcy.

---

8. These are the same conclusions on which the Court previously relied in granting summary judgment for Plaintiff and the Third–Party Defendants on Defendant's third-party claims under 11 U.S.C. § 362(h)—as well as a conclusion that counsel acted any way *but* willfully during the events in question.

■ For the very same reasons, Defendant's protestations of a denial of due process are completely off the mark. His counsel's quotations from various Supreme Court decisions on the due process rights of criminal defendants are inapposite; this is a civil proceeding, brought on the heels of another civil proceeding that involved the same parties, and the constitutional considerations are quite different. When a lack of due process is argued to challenge the use of the preclusion doctrines of *res judicata* or collateral estoppel, the proper inquiry is whether the asserting party had a "full and fair opportunity" to litigate its claims in the prior proceeding, within the meaning of the Fourteenth Amendment to the Constitution. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982); *Butler v. City of North Little Rock*, 980 F.2d 501, 503 (8th Cir.1992); *Gahr v. Trammel*, 796 F.2d 1063, 1066 (8th Cir.1986). As noted earlier, Defendant had this opportunity, and cannot now invoke the Constitution to prevent the application of collateral estoppel.

Notwithstanding Defendant's challenge, then, Plaintiff has demonstrated the second element of collateral estoppel.

### 3. Validity and Finality of Prior Judgment.[9]

■ As the third aspect of his attack on Plaintiff's invocation of collateral estoppel, Defendant argues that the Hennepin County District Court judgment was not final, because he has perfected an appeal from it. When a party to a proceeding in federal court seeks to invoke collateral estoppel on the basis of a prior state-court judgment, state law dictates whether the prior judgment is final. *Huron Holding Corp. v.*

*Lincoln Mine Operating Co.*, 312 U.S. 183, 188, 61 S.Ct. 513, 515, 85 L.Ed. 725 (1940). *See also Kremer v. Chemical Constr. Corp.*, 456 U.S. at 466, 102 S.Ct. at 1889; *Tolefree v. City of Kansas City*, 980 F.2d 1171, 1173–1174 (8th Cir.1992); *Butler v. City of N. Little Rock*, 980 F.2d 501, 503; (all holding that federal courts must give same preclusive effect to state-court judgments that those judgments would be given in courts of state of their origin).

Over 70 years ago, the Minnesota Supreme Court held:

> An appeal with a supersedeas bond does not vacate or annul the judgment appealed from, and the matters determined by it remain *res judicata* until it is reversed.

*State ex rel. Spratt v. Spratt*, 150 Minn. 5, 7, 184 N.W. 31, 32 (1921), and cases cited therein. It has continued to apply this rule. *See Wegge v. Wegge*, 252 Minn. 236, 238, 89 N.W.2d 891, 892 (1958); *Manemann v. West*, 218 Minn. 602, 605, 17 N.W.2d 74, 75 (1944); *Bolsta v. Bremer*, 212 Minn. 269, 271, 3 N.W.2d 430, 431 (1942); *Wilcox Trux, Inc. v. Rosenberger*, 169 Minn. 39, 43, 209 N.W. 308, 310 (1926). In *American Druggists Ins. v. Thompson Lumber Co.*, the Minnesota Court of Appeals extended this rule to the situation where collateral estoppel is invoked. 349 N.W.2d 569, 572 (Minn.Ct.App.1984).

Defendant's citation of *Holen v. Minneapolis–St. Paul Metro Airports Comm.*, 250 Minn. 130, 84 N.W.2d 282 (1957) and *K.E. v. Hoffman*, 452 N.W.2d 509 (Minn.Ct. App.1990) is simply not on point. Those cases dealt with issues completely different from the ones at bar, and had nothing to do with the application of the preclusion doctrines on the basis of a collateral, common-law judgment which is on appeal.[10]

---

**9.** When this Court took this motion under advisement, the parties' cross-appeals were still pending. As noted *supra* at p. 567, a decision was filed in that appeal on the very day that this Court intended to enter the present order. The following analysis is set forth as was intended before Plaintiff's counsel delivered a copy of the appellate decision to the undersigned in the morning mail on January 19, 1993. This is done for two reasons. First, the appellate decision is not a part of the record made and closed on this motion, so the Court cannot take formal

cognizance of it. Second, and alternatively, Defendant has a right to seek further review in the state courts. Until that right is extinguished by the passage of the deadlines for seeking it, as fixed by the state courts' rules, the finality analysis in this order will have continuing vitality, at least potentially.

**10.** *Holen* addressed the question of whether an amendment to a statute must be applied by an appellate court where the amendment is effective after the trial court rendered judgment on

Despite the pendency of Defendant's appeal in the Minnesota State Courts, then, the Hennepin County District Court judgment and its underlying findings are final for the purposes of any collateral application in this adversary proceeding. *See West v. Manemann,* 144 F.2d 905, 906 (8th Cir.1944) (in bankruptcy proceedings before them, federal courts must give effect of finality to pre-petition state-court adjudications on issues relevant to bankruptcy, even though appeal from state-court decision is pending, where state law accords such finality).[11] This conclusion is compelled as it is by the Minnesota authorities cited, and is made even stronger by the lack of a supersedeas bond in the matter at bar. Plaintiff has satisfied the third element of collateral estoppel.

### 4. Essentiality of Prior Findings to Prior Judgment.

Defendant also challenges Plaintiff's satisfaction of the fourth element of collateral estoppel—that the findings which are advanced to trigger preclusion were essential to the earlier adjudication. This requirement operates to prevent judicial *dicta* from triggering the operation of collateral estoppel. Characterizing Judge Johnston's decision as "the nominal results to date from the state court action," Defendant's counsel characterizes it as having "gratuitously conclude[d] that there was fraud committed by" Defendant. He insists that the state court "had no reason for inquiry" into the issue of actual fraud.

To be sure, Minnesota common law allows recovery for harm incurred as a result of negligent misrepresentations, as well as actual, intentional fraud. *See, e.g., Swanson v. Domning,* 251 Minn. 110, 115, 86 N.W.2d 716, 720 (1957) ("innocent" misrepresentation is actionable; proof of intent to deceive "is no longer necessary"); *Forsberg v. Baker,* 211 Minn. 59, 62, 300 N.W. 371, 373 (1941); *Osborn v. Will,* 183 Minn. 205, 209, 236 N.W. 197, 199 (1931); *Tischer v. Bardin,* 155 Minn. 361, 365, 194 N.W. 3, 5 (1923). To the same result, three of the alternative provisions of the Uniform Fraudulent Transfer Act permit relief upon a showing of "constructive" fraud in a debtor's transfer of assets, without requiring the plaintiff to prove that the debtor actually intended to harm creditors by parting with value. *See* MINN.STAT. §§ 513.-44(a)(2) and 513.45.[12] Plaintiff pleaded all of these theories of recovery in its complaint, as well as those focusing on Defendant's alleged actual fraud.

Certainly, Judge Johnston could have based a judgment in Plaintiff's favor solely upon several theories which did not require a finding of deceptive intent on Defendant's part. He did not, however, and it is fatuous and self-serving to argue that his decision is not worthy of preclusive effect because he did not. Given its length and detail, his decision is entitled to the dignity to be accorded any full, fair, and

---

the basis of the prior statute. In holding that the appeal suspended the finality of the judgment before it, the *Holen* court was applying rules governing the retroactive and prospective effect to be given to legislative amendments in cases where statutes furnished the governing substantive law. *See* 250 Minn. at 136–137, 84 N.W.2d at 287. *K.E. v. Hoffman* also dealt with the retroactivity of a statutory enactment, but as applied to a *pending* lawsuit, *with no entered judgment;* its relevance to the present situation is quite obscure.

**11.** This federal case involved the same parties and the same assets in dispute before the Minnesota Supreme Court in *Manemann v. West, supra.*

**12.** These statutes provide that a transfer made by a debtor is fraudulent as to creditors, where:

1. the debtor received less than "a reasonably equivalent value" for the transfer; and either was left with an "unreasonably small" amount of assets to carry on business or intended to, or should have foreseen he would incur, debts beyond his ability to pay, MINN. STAT. § 513.44(a)(2);

2. the debtor received less than "a reasonably equivalent value," and either was insolvent at the time or was rendered insolvent by the transfer, MINN.STAT. § 513.45(a); or

3. the debtor made the transfer to an insider for an antecedent debt, the debtor was insolvent, and the insider knew of the debtor's insolvency, MINN.STAT. § 513.45(b).

None of these statutes require a showing of fraudulent intent on the part of the debtor, though MINN.STAT. § 513.44(a)(1) allows relief upon such a showing.

impartial reading of all of the evidence of record. Defendant has not shown any reason to deny such deference. One then must conclude that Judge Johnston structured his decision as he felt the evidence and the governing law merited, and as justice compelled. Based, as it obviously was, on a conclusion that the evidence warranted and compelled judgment under an actual-fraud theory, not a one of the findings on intent cited earlier are *dicta*. For the purposes of collateral estoppel, essentiality should be determined by

> whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment.

RESTATEMENT (SECOND) OF JUDGMENTS, § 27, comment j. at 260–261 (1982). Every one of the cited findings is essential to the actual-fraud theory under which Plaintiff most strongly asserted a right to judgment, and by which Judge Johnston concluded judgment should be cast. Plaintiff, then, has satisfied the fourth and final element of collateral estoppel.

## B. EQUITABLE ESTOPPEL

As an alternative theory, Defendant argues that Plaintiff is equitably estopped from asserting the preclusive nature of the state-court findings. Under Minnesota law,

> [e]stoppel is an equitable doctrine addressed to the discretion of the court and is intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights.

*Northern Petrochemical Co. v. United States Fire Ins. Co.,* 277 N.W.2d 408, 410 (Minn.1979); *Mut. Serv. Life Ins. Co. v. Galaxy Builders, Inc.,* 435 N.W.2d 136, 140 (Minn.Ct.App.1989). Under the doctrine, a party seeking to bar another party from asserting claims or defenses must prove three elements:

1. That promises or inducements were made;

2. That the invoking party reasonably relied upon the promises; and

3. That the invoking party will be harmed if estoppel is not applied.

*Hydra–Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 919 (Minn.1990).[13] *See also In re Johnson,* 139 B.R. 208, 218 (Bankr. D.Minn.1992).

Defendant bases this argument on Plaintiff's trial counsel's acknowledgement, on the first day of the trial, that Defendant had filed for bankruptcy and that it was enjoined from proceeding against him on that date. His theory fails on the very first of its elements. As noted earlier, Plaintiff's trial counsel made it quite clear that Plaintiff intended to do all it could to proceed to judgment against Defendant in the state court, and had had its request for relief from stay calendared before this Court for a hearing less than 24 hours in the future. Defendant was personally present in the courtroom, and does not deny hearing the colloquy between counsel and Judge Johnston. The notion that counsel somehow induced Defendant to leave the courtroom with a blandishment or misstatement is simply wrong. In point of fact, counsel's statement was a fair warning to Defendant that he might well find his interests in jeopardy if this Court granted Plaintiff's motion and Plaintiff then were free to proceed. Counsel's remarks simply do not constitute an inducement of any sort; qualified as they were, they did not proffer any benefit or advantage to Defendant, were he to leave the trial after they were made. It certainly did not commit Plaintiff to a position from which it could not fairly assert its full legal right to invoke the preclusion doctrines now.

## III. CONCLUSION

In its pre-petition lawsuit against Defendant, Plaintiff pleaded fact allegations

---

**13.** In other decisions, such as *Transamerica Ins. Group v. Paul,* 267 N.W.2d 180 (Minn.1978), the Minnesota Supreme Court has articulated a test for equitable estoppel that identifies more elements. The two formulations, however, are identical in their core requirements. *In re Sunde,* 149 B.R. 552, 557–58 (Bankr.D.Minn. 1992).

which raised the prospect of a debt nondischargeable in bankruptcy. The litigation was complex, involving multiple defendants and several theories of recovery which were not common to all of the defendants. Defendant could have sought the protection of this Court long before Plaintiff and his co-defendants had invested significant time and money in the state-court litigation. Instead, he waited until the very eve of trial to file for bankruptcy. It is hard not to conclude that Defendant planned to cause as much disruption to the trial as possible, as Plaintiff's counsel accuses. In any event, the timing of his bankruptcy filing portended significant complications for the remaining parties in the state-court litigation, more work for the trial judge and counsel in sorting out the parties' respective options and positions in Defendant's absence, and significant delay and duplication of effort and expense were Plaintiff to pursue Defendant on the issues of liability and dischargeability in the new forum of this Court.

 Plaintiff elected not to stand for this, and this Court agreed that it should not. Defendant was fully on notice that he might have to continue to defend himself before Judge Johnston, and that the outcome in the state court could have a serious—and even conclusive—effect on any later dischargeability litigation. As Judge Johnston properly noted, Defendant undertook the risk of prejudice in acting as he did. This Court cannot shelter him from the consequences of that conduct. It is not merely appropriate that Defendant be bound by the outcome in the Hennepin County District Court; the law, and basic fairness, virtually compel it. *See Grogan v. Garner,* 498 U.S. at ——, 111 S.Ct. at 661 (fraud claims that creditors have successfully reduced to judgment under nonbankruptcy law should be excepted from discharge without relitigation of issues of fact common to both causes of action). Judge Johnston's findings on Pacesetter's written financial statements establish a

debt nondischargeable under § 523(a)(2)(B); those on Defendant's oral representations establish one nondischargeable under § 523(a)(2)(A).[14] Plaintiff, then, is entitled to the judgment it seeks, without need of a second trial.

## ORDER FOR JUDGMENT

Upon the foregoing, then,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That Plaintiff's motion for summary judgment is granted.

2. That Defendant's debt to Plaintiff, as fixed and liquidated by a judgment entered on May 20, 1992, in the Minnesota State District Court for the Fourth Judicial District, Hennepin County, under the caption of *SnyderGeneral Corporation v. Pacesetter Heating Supply, Inc., et al,* Court File No. 89–08597, was excepted from the discharge in bankruptcy granted to Defendant by this Court's order of October 1, 1992, in BKY 3–91–3444, by operation of 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**14.** Even though Defendant's fraud technically resulted in a receipt and renewal of credit for his business corporation rather than himself, it will still support a determination of nondischargeability for his guarantor's liability to Plaintiff. *In re Dallam,* 850 F.2d 446, 449 n. 2 (8th Cir.1988); *In re Long,* 44 B.R. 300, 308 (Bankr.D.Minn.1983), *aff'd,* 774 F.2d at 876–877 n. 1.