In re JOLLY'S, INC., Debtor.

Brian F. LEONARD, Chapter 7 Trustee, Plaintiff,

v.

The NORMAN VINITSKY RESIDUARY TRUST; and Shirley Vinitsky and Sidney Kaplan, as Trustees of the Norman Vinitsky Residuary Trust; Svihel Enterprises, Inc.; and James Svihel, individually, Defendants.

Bankruptcy No. 3–94–1110.
Adv. No. 3–94–083.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Nov. 9, 1995.

Brian F. Leonard, Chapter 7 Trustee, Minneapolis, MN.

Bradley J. Halberstadt, Minneapolis, MN, for Defendants Norman Vinitsky Residuary Trust, Shirley Vinitsky and Sidney Kaplan.

John R. Stoebner, Minneapolis, MN, for Defendants Svihel Enterprises, Inc. and James Svihel.

## MEMORANDUM TO AMENDED ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

The Court has entered an amended order to dispose of cross-motions for summary judgment made by the Plaintiff, by Defendants The Norman Vinitsky Residuary Trust ("the Vinitsky Trust"), Shirley Vinitsky, and Sidney Kaplan, and by Defendants Svihel Enterprises, Inc. ("SEI") and James Svihel. As ultimately presented for decision, the motions pertained to Counts I, II, and VI of the Plaintiff's complaint.[1] Pursuant to FED. R.CIV.P. 52(a), *as incorporated by* FED. R.BANKR.P. 7052, this memorandum sets forth the findings of fact and conclusions of law that underlie the amended order.

### NATURE OF PROCEEDING

The Debtor was a Minnesota business concern that operated a number of retail toy and hobby stores in the Minneapolis–St. Paul area. On March 9, 1994, several of its trade creditors filed an involuntary petition for relief under Chapter 7 against it. The Debtor did not contest the petition. An order for relief under Chapter 7 was entered against it on March 31, 1994. The Plaintiff is the Trustee of the Debtor's bankruptcy estate. Defendant SEI was the Debtor's sole shareholder as of the date of the involuntary petition. Defendant Svihel was the president of the Debtor and of SEI, and was SEI's sole shareholder.

As of the date of the order for relief, the Vinitsky Trust held a perfected security interest in all of the Debtor's equipment, inventory, accounts, accounts receivable, contract rights, rights to payment, general intangibles, and their proceeds, under a security agreement executed in 1991. In Counts I and II of his complaint, the Plaintiff seeks to have the transfer of this security interest avoided as a fraudulent transfer within the scope of MINN.STAT. §§ 513.44 and 513.45.

---

1. In his motion papers, the Plaintiff also sought summary judgment as to Counts III and IV of his complaint. He did not make oral argument as to these other three counts, however, and after the hearing, he advised the Court by letter that he did not intend to pursue relief against the Defendants under them.

In Count VI of his complaint, the Plaintiff seeks judgment against SEI in collection on an account receivable in the sum of $12,-254.28, with interest "and other charges as may be proved at trial."

In their joint answer, Defendants SEI and James Svihel deny various material allegations of these counts. They also plead the defenses of waiver, estoppel, unclean hands, and laches in a conclusory fashion. As another affirmative defense, they plead that the

> Plaintiff's purported losses, if any, were caused by persons other than [James] Svihel or SEI, over whom Svihel and SEI had no control.

In their collective answer, Defendants the Vinitsky Trust, Shirley Vinitsky and Sidney Kaplan similarly deny various material allegations of these counts. They plead as an affirmative defense that the "Plaintiff's damages, if any, were the result of conduct of third parties over whom [those] Defendants had no control."

## MOTIONS AT BAR

All three alignments of parties[2] have moved for summary judgment pursuant to FED.R.BANKR.P. 7056.[3]

The Plaintiff served and filed his motion first. To make out his *prima facie* case, he points to various established acts and transactions to which the Debtor had been a party; he then relies on certain indicia of the Debtor's financial condition that appear from the face of various of its books and records that he obtained in the course of his administration. He argues that the facts to meet all of the elements of his fraudulent-transfer counts are proved up by the latter evidence, viewed against the uncontroverted history of the underlying legal and financial relationships. He also notes that the Debtor's records show that SEI unquestionably is liable

on the account receivable. As he would have it, this record demonstrates that there is "no genuine issue of material fact" as to his claims under Counts I, II, and VI, and he is legally entitled to judgment against the Defendants on those counts.

In response, the Vinitsky Defendants maintain that the Plaintiff's record fairly bristles with triable fact issues, but that their own proffered evidence demonstrates that the Plaintiff is incapable of proving up at least one element of each of his fraudulent-transfer counts. Thus, they argue, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) mandates that they be granted a judgment adverse to the Plaintiff on all of his claims against them.

To the extent that the Plaintiff seeks judgment against the Svihel Defendants on his fraudulent-transfer counts, they join in the arguments of the Vinitsky Defendants. The Svihel Defendants acknowledge that SEI is liable to the bankruptcy estate on the account receivable in question, and do not object to entry of judgment on Count VI of the complaint.

## UNDISPUTED HISTORICAL FACTS

The relevant documentary and transactional facts are uncontroverted.

Before November, 1983, Defendants the Vinitsky Trust and Shirley Vinitsky were the Debtor's shareholders. During that month, SEI purchased all of their shares from them. As consideration for the purchase, on November 2, 1983, SEI executed two promissory notes in favor of the Vinitsky Trust in the amounts of $313,600.00 and $6,400.00. For both notes, SEI gave security by pledging

---

**2.** These alignments, of course, are the Plaintiff; Defendants the Vinitsky Trust, Shirley Vinitsky, and Sidney Kaplan (collectively "the Vinitsky Defendants"); and Defendants SEI and James Svihel (collectively "the Svihel Defendants").

**3.** This rule makes FED.R.CIV.P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, FED.R.CIV.P. 56(c) provides that, upon a motion for summary judgment,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

the shares of stock in the Debtor that it was purchasing.[4]

On July 31, 1991, SEI executed an instrument in favor of the Vinitsky Trust, entitled "Amended and Restated Promissory Note." This note memorialized new terms for the satisfaction of the indebtedness remaining under the $313,600.00 note given in November, 1983.[5] "As of" the same date,[6] Defendant Svihel executed a security agreement in favor of Defendants Kaplan and Shirley Vinitsky, in their status as trustees of the Vinitsky Trust. Under his signature line, Svihel identified himself as the president of the Debtor. The text of the agreement identifies the Debtor as the entity that was granting a security interest in its assets. Among the agreement's other recitals are:

C. [the] Debtor and Svihel are financially interested in each other's business operations and affairs; [and]

D. [Kaplan and Vinitsky have] requested, and [the] Debtor has agreed to grant certain security interests in its property as more particularly described herein ...

By the terms of this agreement, the Debtor granted Kaplan and Vinitsky a security interest in all of its equipment, inventory, accounts, accounts receivable, contract rights, rights to payment, general intangibles, and proceeds of all of those categories of assets, then owned or thereafter acquired, to secure the obligation under SEI's July 31, 1991 note.

The Debtor maintained annual financial statements for the years 1984 through 1993. These documents show that between 1984 and 1990 the Debtor experienced a gradual erosion of profits and net worth/shareholder equity, with its first net loss in income occurring in 1990 and its net worth standing at $202,473.25 at the end of that year. When the statement for 1991 is adjusted to charge the third-party debt secured by the newly-granted blanket lien against the value of the debtor's assets, dollar-for-dollar, the Debtor's net worth dropped to a negative $174,126.56 as of the end of that year. From 1991 through 1993 its gross revenues dwindled and its net operating losses continued, increasing from $11,524.50 in 1991 to $65,242.21 in 1993. Again taking the blanket lien in favor of the Vinitsky Trust as a charge against the value of assets, the Debtor's net worth bottomed at a negative $207,899.67 in 1992, and stood at a negative $195,127.90 at the end of 1993.

## DISCUSSION

### I. Standards for Summary Judgment

■■■ A motion for summary judgment presents a two-step inquiry. The first question is whether there is a "genuine issue as to any material fact." FED.R.CIV.P. 56(c). Absent the parties' stipulation to the material facts, this inquiry requires an exhaustive review of the evidence of record—the fruits of discovery and the results of the movant's own investigation. Each point of material evidence must be linked to one or more elements of the claims or defenses that are at issue in the underlying litigation. To be considered in summary judgment analysis, such evidence must be "significant" and "probative," *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990), as well as "substantial," *Krause v. Perryman*, 827 F.2d 346, 350 (8th Cir.1987).

■■■ A defendant may move for summary judgment in its favor on the plaintiff's claims, by pointing out that the extant evidence cannot support a finding in the plaintiff's favor as to one or more of the essential

---

4. The Plaintiff said something to this effect in passing, during oral argument. None of the parties placed any of the documents from the 1983 transaction into the record. SEI's obligations under the notes might have been wholly unsecured, at least insofar as the record here is concerned. In any event, the Defendants do not deny that none of the Debtor's assets were pledged to support the transaction in 1983.

5. The July 31, 1991 note does not state on its face that it applied only to the larger of the two debts created under the November, 1983 notes. However, recital B of the accompanying security agreement does.

6. The "As of" verbiage appears in the dateline to this document. It suggests that this document was executed on a date different from July 31, 1991. There is no other evidence in the record that goes to this point.

elements of the plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. at 2553–54; *City of Mount Pleasant v. Assoc. Electric Co-op., Inc.*, 838 F.2d 268, 273–274 (8th Cir.1988). The responding plaintiff then bears a burden of production of evidence; it can avoid a grant of summary judgment for the defendant only by producing evidence that would support findings in its favor on the element(s) in question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–252, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Firemen's Fund Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir.1993); *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1265 (8th Cir.1990).

■ A plaintiff likewise may move for summary judgment. Though the process of analysis must be phrased somewhat differently due to the different posture, the underlying thought is identical. The plaintiff may amass all of the evidence generated by its investigation and discovery, and then "point out," *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. at 2554, that the evidence supports only the factual theory of its own case, and does not support any pleaded affirmative defense. *In re Mathern*, 137 B.R. 311, 314 (Bankr.D.Minn.1992), *aff'd*, 141 B.R. 667 (D.Minn.1992). To avoid a grant of judgment in favor of the plaintiff, the defendant must produce significant, probative, and substantial admissible evidence that denies the existence of one or more elements of the plaintiff's case, or that would support findings to make out one of its pleaded affirmative defenses. *In re Johnson*, 139 B.R. 208, 214 (Bankr.D.Minn.1992).

■ The second phase of the inquiry is legal in nature; the moving party must demonstrate that it "is entitled to judgment as a matter of law." This is often more perfunctory in the context of a defendant's motion, which is generally premised on the plaintiff's asserted inability to make out a *prima facie* case. When the movant is a plaintiff, of course, its mission is to identify the legal theory on which it relies, and then to demonstrate that the facts that it has mustered entitle it to relief under that theory.[7] Of course, it is still open to a responding defendant to argue that the facts, even if uncontroverted, do not satisfy the recognized elements of the plaintiff's claim, or in some other way fail to meet the legal requirements for the plaintiff's theory of recovery.

## II. Substantive Issues

### A. Counts I and II: Fraudulent-Transfer Theory.

#### 1. Introduction

Though the Plaintiff did not characterize it as such in either brief or oral argument, Counts I and II of his complaint are an attack on a leveraged buyout.[8] He utilizes the Minnesota enactment of the Uniform Fraudulent Transfer Act,[9] MINN.STAT. § 513.41–513.50, as his substantive basis.[10]

The federal courts—particularly the bankruptcy courts—are no stranger to this theory of suit. It seems to have had its first prominent airing in *United States v. Gleneagles Inv. Co., Inc.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd*, *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986). Rather quickly thereafter, many other courts reported decisions in the same sort of case. *E.g., Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir.1992);

---

7. In many cases, the legal dimension of a motion for summary judgment has already been fully aired as a part of the first stage of the analysis. This is particularly true where the materiality of given fact points is at issue. For summary judgment purposes, materiality is measured by whether a given fact "might affect the outcome of the suit *under the governing law*." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis added). *See also, In re Johnson*, 139 B.R. at 214; *In re Mid–City Hotel Assoc.*, 114 B.R. 634, 645–646 n. 6 (Bankr.D.Minn.1990).

8. For brevity, the term "LBO" will be used hereafter.

9. For brevity, the general form of the Uniform Act will be termed "UFTA" hereafter.

10. The Plaintiff is empowered to use these state-law remedies by 11 U.S.C. § 544(b):

The trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C. §] 502 ... or that is not allowable only under [11 U.S.C. §] 502(e) ...

*Lippi v. City Bank,* 955 F.2d 599 (9th Cir. 1992); *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir.1991); *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488 (N.D.Ill.1988); *Credit Managers Ass'n of Southern Calif. v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1985); *In re Bay Plastics, Inc.,* 187 B.R. 315 (Bankr.C.D.Cal.1995); *In re Oxford Homes, Inc.,* 180 B.R. 1 (Bankr. D.Me.1995); *In re Lease–A–Fleet, Inc.,* 155 B.R. 666 (Bankr.E.D.Pa.1993); *In re Richmond Produce, Inc.,* 151 B.R. 1012 (Bankr. N.D.Cal.1993); *In re Chas. P. Young Co.,* 145 B.R. 131 (Bankr.S.D.N.Y.1992); *In re O'Day Corp.,* 126 B.R. 370 (Bankr.D.Mass.1991); *In re Suburban Motor Freight, Inc.,* 124 B.R. 984 (Bankr.S.D.Ohio 1991); *In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. 982 (Bankr.D.Minn.1989); *In re Ohio Corrugating Co.,* 91 B.R. 430 (Bankr.N.D.Ohio 1988).[11]

As the Third Circuit noted in *Tabor Court,* A leveraged buy-out is not a legal term of art. It is a shorthand expression describing a business practice wherein a company is sold to a small number of investors, typically including members of the company's management, under financial arrangements in which there is a minimum amount of equity and a maximum amount of debt. 803 F.2d at 1292. *Tabor Court* identifies one of the signal characteristics of an LBO:

... investors borrow ... substantially all of the purchase price [for the shares in the acquired company] at an extremely high rate of interest secured by mortgages on the assets of the selling company *and its subsidiaries and those of additional entities that guaranteed repayment.*

*Id.* (emphasis added). *See also* Smyser, *Going Private and Going ·Under: Leveraged Buyouts and the Fraudulent Conveyance Problem,* 63 IND.L.REV. 781, 784–785 (1988);

Carlson, *Leveraged Buyouts in Bankruptcy,* 20 GA.L.REV. 73, 74–75 (1985).

Often, the acquiring entity in an LBO is a shell holding company, devoid of assets before it receives the shares of stock in the acquired company that actually carries on business. The acquiring entity is the nominal borrower under the "leveraging," the financing that is taken out to pay for the shares in the acquired company. To provide collateral for this extension of credit, however, the acquiring entity utilizes the control over its acquisition that is afforded by its new status as shareholder, and has the acquired company pledge its assets for the new debt of its parent. The newly-acquired subsidiary may itself assume liability for the debt via guarantee, but this is not an invariable characteristic of an LBO. In any event, after the acquisition the parent generally services the leveraged debt with funds extracted from the ongoing operations of the acquired company—which are usually denominated shareholder dividends, or sometimes as loans to the parent.

If the combined demands of post-LBO operating expenses and the second-level servicing of the parent's debt outstrip the acquired company's financial means, it may be put into bankruptcy voluntarily or involuntarily. When that happens, its debt structure is usually characterized by a large amount of unsecured trade indebtedness, usually owing to many different suppliers. Its equipment, inventory, accounts, and other assets, however, are encumbered by the lien granted to secure the leveraged debt of its acquirer-parent. Standing in the shoes of the disgruntled trade suppliers whose credit supported the debtor's operations during its financial downfall, the trustee in bankruptcy[12] undertakes to get the lien divested, on the

---

11. The remedy has also received much scholarly commentary. *E.g.,* White, *Leveraged Buyouts and Fraudulent Conveyance Laws Under the Bankruptcy Code—Like Oil and Water, They Just Don't Mix,* 1991 ANN.SURV.AM.LAW 357; Wahl and Wahl, *Fraudulent Conveyance Law and Leveraged Buyouts: Remedy or Insurance Policy?* 16 WM. MITCHELL L.REV. 343 (1990); Sherwin, *Creditors' Rights Against Participants in a Leveraged Buyout,* 72 MINN.L.REV. 449 (1988); Murdoch, Sartin, and Zadek, *Leveraged Buyouts and Fraudulent*

*Transfers: Life After Gleneagles,* 43 BUS.LAW. 1 (1987); Kirby, McGuinness, and Kandel, *Fraudulent Conveyance Concerns in Leveraged Buyout Lending,* 43 BUS.LAW. 27 (1987); Baird and Jackson, *Fraudulent Conveyance Law and Its Proper Domain,* 38 VAND.L.REV. 829 (1985).

12. A debtor in possession under Chapter 11 may also fall under the rubric of "trustee," pursuant to 11 U.S.C. § 1107.

theory that it was granted in a transfer that was fraudulent as to the creditors of the acquired company.

Such attacks are often styled under the "actual fraud" provisions of fraudulent-transfer statutes—*i.e.*, that the architects of the LBO actually intended to mulct the acquired company's independent creditors of the value of the right to recover on their trade claims. As or more often, the trustee also invokes the "constructive fraud" provisions of the same laws, based on the complaint that the acquired, operating subsidiary received nothing for itself out of the transaction in which its assets were encumbered for the debt of its acquiring parent, and was left unable to meet its own bona fide financial obligations as a result.[13]

The Plaintiff sued out this adversary proceeding under both variants of fraudulent-transfer theory. He separated the two relevant counts of his complaint by the specific statutory provision under which he brought them, rather than by the variant of the theory.

### 2. Count I: Minn.Stat. § 513.44

Count I of the Plaintiff's complaint sounds under Minn.Stat. § 513.44, which provides that "[a] transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made," if the transfer was accompanied by certain characteristics. This statute includes both the "actual fraud" provision of the UFTA, and one of its three "constructive fraud" provisions. It gives a remedy to creditors whose claims predated a subject transfer, and to those whose claims arose after it.[14]

#### a. Minn.Stat. § 513.44(a)(1): Actual Fraud.

Under the first theory of Count I, the Plaintiff maintains that the Debtor pledged its assets for SEI's debt "with actual intent to hinder, delay, or defraud [its] creditor[s] ...," within the meaning of Minn.Stat. § 513.44(a)(1). Of course, as an artificial person the Debtor itself could not harbor such an intent; the question is whether James Svihel, its sole principal, did, when he pledged the Debtor's assets. The Plaintiff acknowledges that he has no direct evidence that he did. Under the authority of *Argonaut Ins. Co. v. Cooper*, 395 N.W.2d 119 (Minn.App.1986), however, he argues that the transaction was accompanied by enough "badges of fraud" that a presumption of intent to harm present or future creditors is created. As such badges, he points to the facts that the pledge encumbered substantially all of the Debtor's assets, that the pledge was in favor of one of the Debtor's former shareholders, that the Debtor received nothing by way of cash or other tangible consideration, and that the Debtor did not disclose the existence of the encumbrance on its financial statements after it made the pledge.

The gist of the Plaintiff's argument seems to be that these "badges" aggregate to such weight that no other reasonable inference as to Svihel's intent is possible. *See In re Mathern*, 137 B.R. at 322 (movant for summary judgment may rely on fact inference to satisfy statutory element of specific intent if it produces such "overwhelming" circumstantial evidence going to that element that no other reasonable inference is possible).[15]

---

13. In light of this theory, this case has an interesting sidelight: at least insofar as the attachment of an all-encumbering lien to the acquired company's assets is concerned, this was a buyout that only *later* became leveraged. This wrinkle does not affect the applicability of fraudulent-transfer law to the transaction, but it does not necessarily make the Plaintiff's burden any lighter either.

14. The Defendants do not deny that there are numerous scheduled creditors whose allowable and unsatisfied claims against the Debtor arose after the lien was granted. As a result, the Plaintiff clearly has standing to seek relief under Count I.

15. In arguing that he has the benefit of a presumption, the Plaintiff is technically wrong. His cited authority, *Argonaut Ins. Co. v. Cooper*, was decided under a law since repealed—the Minnesota enactment of the Uniform Fraudulent Conveyance Act, former Minn.Stat. §§ 513.20–.32. The UFCA did not contain any provisions to structure the process of fact-finding on the issue of intent, whether by creating a presumption or otherwise. The device recognized in *Argonaut Ins. Co. v. Cooper*, then, was judicially-engrafted, and with the change in the law may no longer be applicable. However, Minn Stat § 513.44(b) does contain an aid for fact-finding. It allows the court to *consider* certain specified badges of fraud in passing on the question of the transfer-

The Defendants, however, have borne their burden to respond to the Plaintiff's showing. In his responsive affidavit, Defendant Kaplan tersely but convincingly states:

1. "[a]bsent renegotiation [of the terms of the 1983 note], SEI would have been in default";

2. "[i]n light of an unresolved default, the [Vinitsky] Trust would have foreclosed on the [Debtor's] share owned by SEI"; and

3. "[a]s a condition of the extension, renegotiation, and decreased payments [under the 1991 note], the [Vinitsky] Trust insisted that [the Debtor] grant to the [Vinitsky] Trust a security interest in its assets to secure repayment of the note."

Kaplan also attests that, in the event of a foreclosure of its security interest in SEI's stock in the Debtor, and because "the [Vinitsky] Trust was not interested in running [the Debtor's business], the [Vinitsky] Trust would have either attempted to resell the ... shares or would have forced [the Debtor] to dissolve and remit the proceeds to the [Vinitsky] Trust."

In turn, in his responsive affidavit Defendant Svihel recites the history of the LBO of the Debtor. He then summarizes his motivation and intention in having the Debtor pledge its assets:

1. "[t]he Debtor was attempting to preserve its business by avoiding the possibility of liquidation by the [Vinitsky] Trust";

or's actual intent. These circumstances include whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

2. as a result of the renegotiation of SEI's payment obligations, the Debtor "expected to continue to operate and generate sufficient cashflow to support its renegotiated debt and other debts"; the forbearance and extension benefitted the Debtor, by lessening the amount of the shareholder dividends it had to pay to SEI to support the debt service to the Vinitsky Trust;

3. "[a]fter the time of renegotiation, [the Debtor] believed it could continue to pay its debts as they became due"; and

4. as of the date of the pledge of its assets, the Debtor "reasonably believed that the chance of foreclosure by the [Vinitsky] Trust was less than 50 percent."

Finally—and predictably—Svihel makes the usual conclusory disclaimer: the Debtor "did not intend to hinder, delay, or defraud creditors by granting the [Vinitsky] Trust a security interest in its assets."

These statements-by-affidavit are, of course, carefully crafted by counsel to say no more than what they have to. Nonetheless, they have to be classified as probative and substantial evidence. Their probity and substance is reinforced when they are viewed against other surrounding circumstances: the Debtor continued to maintain operations for two years after the pledge—and, though its net worth fell, became negative, and then became more negative, the drop stopped and then reversed to a small degree in the Debt-

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The court can also consider any other circumstance that accompanied the transfer. The statute does not *compel* an inference from any one of these factors, or any combination of them. To the extent that the Plaintiff can satisfy his burden under Rule 56 as outlined in *Mathern,* however, the end result is the same as if a presumption were applicable—the burden of production of evidence on the issue of intent shifts to his opponents. *See* FED.R.EVID. 301.

or's last year of operation. This evidence could support a finding that Svihel had not had the intent to extract all the value of the Debtor's assets, so as to deprive its other creditors of a realization on their claims, when he pledged those assets to the Vinitsky Trust.

The record made for this motion, then, is amenable to opposing findings on the ultimate fact question; it "presents a sufficient disagreement to require submission to" a finder of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–252, 106 S.Ct. at 2512. Neither the Plaintiff nor any of the Defendants are entitled to summary judgment on the actual-fraud theory claim under Count I. *In re Miera*, 104 B.R. 989, 998 (Bankr. D.Minn.1989).

### b. MINN.STAT. § 513.44(a)(2): Constructive Fraud

■ In the alternative, the Plaintiff styles Count I under MINN.STAT. § 513.44(a)(2). Under that provision,

[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer . . .

. . . . .

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Under this provision, the Plaintiff must establish two elements. The first, of course, is the lack of "reasonably equivalent value" for the security interest granted by the Debtor on account of its new parent's debt. This element, really, is the driving force behind the application of the law of constructively-fraudulent transfers to LBOs—the gut-level thought being that the acquired company, a stranger to the credit transaction between its prospective parent and the LBO lender, receives nothing of recognizable value to compensate it for the loss of its equity in its assets. Because the rationale behind the use of fraudulent-transfer remedies in bankruptcy "is to preserve the assets of the estate," *In re Ohio Corrugating Co.*, 70 B.R. at 927, this element is often the central focus of argument in these cases.

The Plaintiff properly points out that the Debtor was never liable to the Vinitsky Trust under any of the promissory notes, or in any other way. The Debtor's pledge, then, did not go to secure a contemporaneous or pre-existing debt of its own; as the Plaintiff argues, the Debtor's assets became burdened by the pre-existing debt of its parent, but the Debtor did not receive any economic value that would have preserved the parity of its own balance sheet.

The Plaintiff then is correct in his threshold point: the direct and undeniable beneficiary of the pledge was SEI. SEI, after all, was able to prevail upon the Vinitsky Trust to reamortize its outstanding debt, and it headed off the possible loss of its equity holding in the Debtor.

For the application of fraudulent-transfer remedies in bankruptcy,

[t]ransfers made or obligations incurred solely for the benefit of third parties do not furnish reasonably equivalent value [to the debtor].

*In re Minnesota Utility Contracting, Inc.*, 101 B.R. 72, 85 (Bankr.D.Minn.1989), *aff'd*, 110 B.R. 414, 419 (D.Minn.1990) (applying 11 U.S.C. § 548(a)(2)(A); citing *In re Ear, Nose & Throat Surgeons of Worcester, Inc.*, 49 B.R. 316 (Bankr.D.Mass.1985)). *See also Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979); *Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 829 (5th Cir.1959), *cert. den.*, 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960) (all decided under Bankruptcy Act of 1898). The Plaintiff, then, prevails on this aspect of the element of reasonably equivalent value.

Undaunted, the Vinitsky Defendants respond that the Debtor received an "indirect benefit" from the renegotiation of SEI's debt, which was reasonably equivalent to the value it surrendered in the pledge. This sort of consideration has been recognized in fraudulent-transfer analysis. *In re Minnesota Utility Contracting, Inc.*, 101 B.R. at 84, *aff'd*, 110 B.R. at 419–420. *See also Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d at 991. However, "the benefit must be fairly concrete." *In re Minnesota Utility Contracting, Inc.*, 110 B.R. at 420. *See also In re Grabill Corp.*, 121 B.R. 983, 995 (N.D.Ill. 1990); *In re Burbank Generators, Inc.*, 48 B.R. 204, 206–207 (Bankr.C.D.Cal.1985). Further, once it has been proven that all of the consideration for a debtor's transfer of assets went directly to a third party, the defendant seeking the shelter of the "indirect benefit" defense bears the "intermediate" burden *of production* as to the concreteness of the indirect benefit, and its reasonable equivalence in value. *In re Minnesota Utility Contracting, Inc.*, 110 B.R. at 417–419. The burden of persuasion—applied when the evidence is in equipoise—always remains with the plaintiff. *In re Minnesota Utility Contracting, Inc.*, 110 B.R. at 419.

The Defendants have not carried this burden. They have identified only one circumstance as an indirect benefit that the Debtor would have derived from the pledge of its assets: the opportunity to continue to carry on business, relieved of the immediate threat of foreclosure by the Vinitsky Trust. This evidence, however, cannot support a reasonable inference as to the ultimate fact here—that *the Debtor* received something of concrete value to *it*, that it otherwise would not have had.

The reason springs from the forms of business organization that Svihel used to structure his ownership of the business. The Debtor, as an artificial person under state law, was legally distinct from Svihel and from SEI. *Di Re v. Central Livestock Order Buying Co.*, 246 Minn. 279, 74 N.W.2d 518, 523 (1956); *Matthews v. Minnesota Tribune Co.*, 215 Minn. 369, 10 N.W.2d 230, 232 (1943). The Debtor's rights and liabilities were independent of Svihel's and SEI's. *Rommel v. New Brunswick Fire Ins. Co.*, 214 Minn. 251, 8 N.W.2d 28, 32 (1943). From a vantage point after the Debtor's financial failure, these independent attributes gave rise to distinguishable interests. Because the putative "benefit" to be derived from a transfer is logically defined as an advancement of the recipient's defined interests, a divergence of such interests can bear on the specialized fraudulent-transfer analysis at bar, in a very crucial way: if the result of the transfer is not to advance or augment the interests of the putative recipient, it cannot be said that the transfer conferred a benefit, direct or indirect.

What, then, were the several interests of the Debtor, SEI, and Svihel, when the Vinitsky Trust demanded the pledge of the Debtor's assets?

Svihel, of course, had an interest in holding onto the underlying retail business as a going concern, with the structure of ownership and control that he had assembled to acquire it. His goal was to preserve both SEI and the Debtor as intact, functioning companies, and not unreasonably so. Svihel's and SEI's interests in this regard were essentially one, driven by SEI's financial obligations to the Vinitsky Trust. As was shown by the actual course of events, to protect this interest Svihel would—and did—do just about anything that was arguably within the bounds of legality.

The Debtor's interests, on the other hand, were not as concrete. Because of the legal fiction of corporate personality, too, those interests are not as readily defined. The Debtor, after all, was not alive and conscious; it was a mere instrumentality, the deemed actions of which could affect the legal and financial interests of various constituencies—here, its creditors and its shareholders. The Minnesota Supreme Court has cautioned against taking a "metaphysical approach to the law of corporations," in the sense of overimbuing the fictive personality with human attributes. *Lenhart v. Lenhart Wagon Co.*, 210 Minn. 164, 298 N.W. 37, 40 (1941). It has also recognized that

> if [a corporation] is to function at all in its chosen or granted field of operation, it

must act through or by means of human direction. It is impotent otherwise.

*Rommel v. New Brunswick Fire Ins. Co.*, 8 N.W.2d at 32.

■■■■■ At first glance these authorities seem to suggest that a closely-held corporation cannot be deemed to have motivations, goals, and interests independent of those of its individual principals. This, however, is not correct.

> Stockholders do not in any proper or legal sense transact the corporate business through the corporation. The corporation is a legal entity which as such transacts its [own] corporate business.

*Wilson v. Maryland*, 152 Minn. 506, 189 N.W. 437, 439 (1922). Beyond this, in any legal proceeding brought to deal with a corporation's financial failure after the fact, the court can identify distinctive interests in the corporation that may be at odds with the equity interests of its shareholder-principals. This is because state law prioritizes the competing claims of shareholders and creditors against the value of the corporation:

> ... when the corporation is lawfully dissolved, and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among shareholders.

*Hospes v. Northwestern Mfg. & Car Co.*, 48 Minn. 174, 50 N.W. 1117, 1119 (1892) (Wm. Mitchell, J.) (quoting *Wabash, St. L. & P. R.R. Co. v. Ham*, 114 U.S. 587, 594, 5 S.Ct. 1081, 1084, 29 L.Ed. 235 (1885)). *See also Lebens v. Nelson*, 148 Minn. 240, 181 N.W. 350, 352 (1921). Expressed another way, and in the context of a corporation maintaining ongoing operations,

> ... the distribution of the capital among stockholders without making adequate provision for the payment of debts ... is a fraud upon creditors who contract with the corporation in reliance upon its capital remaining intact ...

*Erickson–Hellekson–Vye Co. v. A. Wells Co.*, 217 Minn. 361, 15 N.W.2d 162, 170 (1944).[16]

Though they were developed in a different substantive context, these precepts furnish the necessary guidance to determine whether the Debtor received an indirect benefit from the pledge of its assets. For the particularized fraudulent-transfer analysis required here, the benefit, if any, derived by the Debtor has to be determined with reference to its effect on the Debtor's own creditors. In a very real way, the law made the Debtor's interests in connection with the LBO coincident with the interests of its creditors. When the pledge was made, those creditors had a higher claim to the Debtor's resources under law than did SEI, its shareholder. That claim may not have been mirrored by direct legal duty to those creditors, enforceable at law on a contemporaneous basis. Nonetheless, the senior allegiance the Debtor owed to its creditors made their interests common with its own, and opposed to those of any other party that could extract value from the Debtor. For the purposes of this proceeding, the Debtor must be deemed to have had an overriding interest in seeing that its own creditors were paid. This is so whether one attributes the Debtor with a motivation to survive as a going concern, or not.[17]

More crucially, given the necessary focus on third-party creditors' interests, the Debt-

---

16. Strictly speaking, this rule does not create a true trust relationship. Minnesota has not adopted the "trust fund theory" applied in this context in some other jurisdictions. *Farmers Cooperative Ass'n of Bertha v. Kotz*, 222 Minn. 153, 23 N.W.2d 576, 579 (1946); *Hospes v. Northwestern Mfg. & Car Co.*, 50 N.W. at 1119–1120.

17. One might object that a court should not judge the merits of an LBO in hindsight, particularly by applying a structure of analysis that presupposes financial failure as the basis for its hierarchy of claims. *See* Baird and Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand L.Rev. at 850–854. This objection is fundamentally a philosophical one, based on a presumption that fraudulent-transfer remedies simply should not lie against a complex tool for enterprise acquisition and capitalization. However, many of the Minnesota Supreme Court cases cited earlier—as well as *Wabash, St. L. & P. R.R. Co. v. Ham*—recite principles of fraudulent-transfer law in virtually the same breath as they enunciate the primacy of creditors' claims in the liquidation of insolvent corporations. This demonstrates that these two considerations are indeed connected by the seamless web; regardless of its humble origins in the collection of simple debts, there is nothing in the basic nature of fraudulent-transfer law *that should prevent its* application to a situation where large creditor constituencies have lost the benefit of their rights

or cannot be deemed to have had any particular interest in the identity of its shareholder. The Defendants identify the prospect of uninterrupted operations with Svihel at the helm, as the indirect benefit flowing from the pledge to the Debtor. They proffer the Vinitsky Trust's alleged willingness to liquidate the Debtor's operations as the evidence to make out this benefit as a matter of fact. Even setting aside the dubious credibility of this statement,[18] it cannot make out a genuine issue of material fact. The subordination of equity interests under state law renders immaterial all considerations of the continuation or termination of SEI's stockholding. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. The Defendants cannot make out a triable fact issue on indirect benefit no matter how much evidence they bring forward.

Had the Vinitsky Trust foreclosed against the stock, the result would have been the same whether it had tried to find a buyer on a going-concern basis, or whether it had closed shop and dissolved the corporation under Minnesota statute: the senior interests of the Debtor's creditors would have received payment from sale proceeds *that were unencumbered,* to the full extent of that unencumbered value, and the Debtor's senior duty to its creditors would have been discharged. Against the reality of this alternative outcome, the alleged benefit of a respite from the Vinitsky Trust sublimates—from its argued solidity into the most tenuous of vapor. The inference of an indirect benefit urged by the Defendants cannot be reasonably sustained by the evidence.

In a variant of this argument, the Defendants maintain that the direct benefit to SEI should be deemed a benefit to the Debtor because of their "identity of interests." They rely in *In re Minnesota Utility Contracting, Inc.*, 101 B.R. at 85, as well as *In re Miami Gen. Hospital, Inc.*, 124 B.R. 383, 394–395 (Bankr.S.D.Fla.1991), *In re Augie/Restivo Baking Co., Inc.*, 87 B.R. 242, 247 (Bankr. E.D.N.Y.1988), and *In re Royal Crown Bottlers of N. Alabama, Inc.*, 23 B.R. 28, 30 (Bankr.N.D.Ala.1982). To establish this "identity," the Defendants point to no more than the fact that SEI and the Debtor had a single common shareholder, manager, and principal, in the form of Svihel. This lone circumstance is far from enough—and the earlier analysis identifying the parties' relevant interests show that there was anything but an identity of them. One cannot, then, attribute the direct benefit Svihel and SEI got from the renegotiation downstream so as to impute the receipt of a reasonably equivalent value to the Debtor.

This means that the Defendants' motions for summary judgment as to this theory must be denied, but it does not mean that the Plaintiff's motion must be granted. Under the alternative elements of MINN.STAT. §§ 513.44(a)(2)(i)–(ii), the Plaintiff must essentially show that the transfer caused a detriment to the unsatisfied creditors whose interests the statute protects, by leaving the debtor unable to pay their claims. As evidence to meet this element, the Plaintiff points out that the Debtor immediately slipped into a high negative net worth, and that its several-year pattern of operating deficits continued and accelerated until it was forced into bankruptcy.

This is certainly telling evidence, and it goes directly to the alternative elements.

to collection as a result of a debtor's transfer of value. It might offend some schools of legal philosophy to retroject a frame of analysis that presumes financial failure, back to a time when the subject enterprise's options were still open and viable. The remedy, however, is invariably and solely applied where failure *did* transpire. Thus, there is nothing untoward about giving primacy to the interests of the constituency that stands to lose the most from that failure. *See, in general, discussion in In re Bay Plastics, Inc.*, 187 B.R. at 335. In any event, there is another check to prevent the overbroad application of such remedies and any dislocation in the flow of capital that could result: the proponent of provisions like MINN.STAT. § 513.44(a)(2) must still prove a

form of causality between the transfer and the debtor's later financial failure, under the alternative elements of MINN.STAT. §§ 513.44(a)(2)(i)–(ii). *See* discussion at pp. 845–46 *infra.*

18. After foreclosing against SEI's shareholding, the Vinitsky Trust presumably would have reexerted control over the Debtor's business in a way to maximize its recovery of value. As the Plaintiff points out—and as the Vinitsky Defendants even acknowledge—this would have required continuing operations and marketing the business for sale as a going concern, at least for some time, before resorting to a liquidation of assets.

However, as the Defendants note, the Debtor was still able to pay all creditors' claims that predated the pledge of its assets, and to maintain its inventory on the use of revolving trade-vendor credit for nearly three years after that. Its net worth even rebounded slightly during its last calendar year of operations. This evidence, with Svihel's more summary statements, has sufficient probity and substance to support findings contrary to the Plaintiff on the alternative elements.

In many respects, both sides are resorting to evidence that is clearly too broadbrushed—and perhaps a little too impressionistic—to fully address the rather complex and abstruse fact questions raised by MINN. STAT. §§ 513.44(a)(2)(i)–(ii). What evidence there is, however, raises triable fact issues. The Plaintiff is not entitled to summary judgment under the alternative theory of Count I of his complaint.

### 3. Count II: MINN.STAT. § 513.45.

■■■ Count II of the Plaintiff's complaint sounds under MINN.STAT. §§ 513.45(a)–(b). Both of these provisions make "[a] transfer made . . . by a debtor . . . fraudulent as to a creditor whose claim arose before the transfer was made . . .," if the transfer was accompanied by certain specified indicia.

■■■■■■ By the very terms of the statute, remedies under MINN.STAT. § 513.45 are available to a narrower class of plaintiffs than those under MINN.STAT. § 513.44. Only creditors whose claims were in existence as of the date of a challenged transfer may seek to avoid it under MINN.STAT. § 513.45.[19] To establish the bankruptcy estate's standing under these provisions of the UFTA, a trustee must demonstrate that at least one creditor's claim that existed as of the date of the transfer survived unsatisfied to the commencement of the bankruptcy case. *Lippi v. City Bank,* 955 F.2d at 606; *Kupetz v. Wolf,* 845 F.2d at 849–850; *In re Richmond Produce Co., Inc.,* 151 B.R. at 1016 n. 5; *In re*

*Ohio Corrugating Co.,* 91 B.R. at 435.[20] Where a trustee is invoking fraudulent-transfer remedies to avoid a lien granted as part of an LBO, the trustee must show that at least one allowable claim against the bankruptcy estate existed when the LBO was consummated by the attachment of the lien. *In re Richmond Produce Co., Inc.,* 151 B.R. at 1016 n. 5.

The Vinitsky Defendants deny that the Plaintiff has standing to sue under this provision, and have moved for summary judgment on Count II on the ground that he does not. To make their factual showing they produce the simple, but unequivocal, statement in Svihel's affidavit:

> All claims, other than the [Vinitsky] Trust's, that existed on July 30, 1991 have been paid by [the Debtor].

The Plaintiff has not brought forth a bit of evidence to rebut this, other than noting that the Vinitsky Trust will have a substantial deficiency claim in this case even if its lien is not avoided. The Plaintiff's theory, apparently, is that a trustee may rely on the existence of an allowable claim in favor of the secured lender whose position he is attacking, to satisfy the statutory requirement of a surviving contemporaneous creditor.

■■■■■■ This argument is without merit; it is a caricature of technicality, riven with an unsustainable tautology. The "strongarm" provisions of § 544 vest the trustee with certain lien-avoidance powers granted to creditors under state law, so the estate can advance the interests of those same creditors by using the remedies to recover value. It confounds the imagination to think that Congress contemplated a trustee assuming the status of an undersecured creditor, manipulating the unsecured component of its claim in order to attack the secured status of the balance of the claim. Section 544 is designed to transplant independent, nonbankruptcy remedies into a trustee's arsenal, but not to enhance them in any way. Fraudulent trans-

---

**19.** Minnesota fraudulent conveyance law early recognized different standing requirements for pre-existing and subsequent creditors. *See Nielson v. Larson,* 158 Minn. 305, 197 N.W. 259, 261 (1924), and cases cited therein (applying law in effect before Minnesota enactment of the UFTA and the UFCA.)

**20.** In recent *dicta,* the Eighth Circuit noted that § 544(b), and the state-law remedies it incorporates, apply "if an unsecured creditor existed at the time the transfer was made." *In re Graven,* 64 F.3d 453, 456 n. 5 (8th Cir.1995). Given the existence of broader provisions of state statutes like MINN.STAT § 513.44, this statement should be qualified.

fer law should not work within bankruptcy to any effect different from outside bankruptcy. It is impossible to conceive of a situation outside of bankruptcy, where an unsatisfied creditor would use a fraudulent-transfer theory to defeat its own secured position, for the benefit of its unsecured position.

The Vinitsky Defendants, then, have shown that there is no genuine issue of material fact as to the Trustee's standing to litigate Count II of the complaint, and that they are entitled to judgment as a matter of law. The Trustee cannot attack the Vinitsky Trust's secured position under this theory.[21]

#### 4. Count VI: Collection of Account Receivable.

In Count VI of his complaint, the Plaintiff sought judgment against SEI, in collection of an unpaid account receivable. In its answer and in its response to the Plaintiff's motion, SEI did not deny liability. It acknowledges that judgment can be entered against it. The Plaintiff's motion, then, has been granted in this respect.

---

**21.** This conclusion moots any discussion of the other questions posed by the parties under Count II: a rather involved insolvency issue, and the question of whether the Vinitsky Trust was an insider with reasonable cause to believe that the Debtor was insolvent when the buyout was leveraged.